167 P.3d 292

**The SIERRA CLUB, a California nonprofit corporation registered to do business in the State of Hawai'i; Maui Tomorrow, Inc., a Hawai'i non-profit corporation; and the Kahului Harbor Coalition, an unincorporated association, Plaintiffs–Appellants**

**v.**

**The DEPARTMENT OF TRANSPORTATION of the State of Hawai'i; Barry Fukunaga, in his capacity as Director of the Department of Transportation of the State of Hawai'i; Michael Formby in his capacity as Deputy Director for Harbors of the Department of Transportation of the State of Hawai'i;[1] and Hawaii Superferry, Inc., Defendants–Appellees.**

**No. 27407.**

Supreme Court of Hawai'i.

Aug. 31, 2007.

As Corrected Oct. 1, 2007.

and Michael Formby, the current Deputy Director for Harbors, has been substituted for Barry Fukunaga, who previously held that position.

Isaac Hall, Wailuku, on the briefs, for plaintiffs-appellants The Sierra Club, Maui Tomorrow, Inc., and the Kahului Harbor Coalition.

William J. Wynhoff, Deputy Attorney General, on the briefs, for defendants-appellees The Department of Transportation of the State of Hawaiʻi; Barry Fukunaga, in his capacity as Director of the Department of Transportation of the State of Hawaiʻi; Michael Formby, in his capacity as Deputy Director for Harbors of the Department of Transportation of the State of Hawaiʻi.

Lisa Woods Munger, Lisa A. Bail, and Jill Murakami Baldemor (of Goodsill Anderson Quinn & Stifel), Honolulu, on the briefs, for defendant-appellee Hawaii Superferry, Inc.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by DUFFY, J.

Plaintiffs–Appellants the Sierra Club, Maui Tomorrow, Inc., and the Kahului Harbor Coalition[2] appeal from the July 12, 2005 final judgment of the circuit court of the second circuit,[3] ruling in favor of Defendants–Appellees State of Hawaiʻi Department of Transportation (DOT or HDOT); Rodney Haraga, in his capacity as Director of DOT (substituted by Barry Fukunaga, see supra note 1); Barry Fukunaga, in his capacity as Deputy Director for Harbors of DOT (substituted by Michael Formby, see supra note 1); and Hawaii Superferry Inc. The underlying dispute in this litigation is whether DOT was required to perform an environmental assessment (EA), under Hawaiʻi Revised Statutes (HRS) chapter 343 (1993 & Supp.2004), commonly referred to as the Hawaiʻi Environmental Policy Act (HEPA),[4] before approving various harbor improvements and permits associated with the Hawaii Superferry project, or whether its determination that the project was exempt from chapter 343 requirements was proper.

The circuit court granted the separate motions of the State and Superferry to dismiss or, in the alternative, for summary judgment, ruling that: (1) Plaintiffs lack standing; (2) DOT's actions complied with HRS chapter 343; (3) Plaintiffs' claim relating to the Draft EA for the Kahului Commercial Harbor Improvements was premature; and (4) Plaintiffs' request for a continuance to permit discovery was insufficient under Hawaiʻi Rules of Civil Procedure (HRCP) Rule 56(f).

---

2. The Sierra Club is a California non-profit corporation registered to do business in the State of Hawaiʻi; Maui Tomorrow, Inc. is a Hawaiʻi non-profit corporation; and the Kahului Harbor Coalition is an unincorporated association.

3. The Honorable Joseph E. Cardoza presided over this matter.

4. Although the original bill was called "A Bill for an Act Relating to Environmental Impact Statements," 1974 Haw. Sess. L. Act 246, and HRS chapter 343 is entitled "Environmental Impact Statements," the law has long been referred to, by the public and this court, as the Hawaiʻi Environmental Policy Act.

On appeal, Appellants argue that: (1) the circuit court erred in dismissing Appellants' claim on the basis of standing because Appellants are among those injured by potential adverse impacts caused by the Hawaii Superferry project, and also because they suffer a procedural injury; (2) the circuit court erred in granting summary judgment in favor of Appellees by ruling that they complied with HEPA, because the exemptions were illegal and did not apply; (3) the circuit court erred in dismissing, as premature, Appellants' claim that the Hawaii Superferry project must be incorporated into the ongoing EA for Kahului Harbor Improvements, because the harbor exemptions were unlawfully segmented from the already initiated but incomplete EA; and (4) the circuit court erred in refusing to continue the hearing to permit further discovery because there was a factual dispute as to what was before DOT in making its exemption determination.

On August 23, 2007, we issued an order reversing the July 12, 2005 circuit court judgment, holding that DOT's determination that the improvements to the Kahului Harbor are exempt from the requirements of HRS chapter 343 was erroneous as a matter of law, and instructing the circuit court to enter summary judgment in favor of Appellants on their claim as to the request for an EA. We maintained concurrent jurisdiction to issue this opinion.

## I. BACKGROUND

The Hawaii Superferry project generally involves an inter-island ferry service between the islands of Oʻahu, Maui, Kauaʻi, and Hawaiʻi, using harbor facilities on each island. According to a permit application filed with the Public Utilities Commission (PUC) on July 22, 2004,[5] Hawaii Superferry, Inc. has proposed to develop and operate a high-speed roll-on/roll-off ferry service, using two vessels, capable of carrying up to 866 passengers and 282 cars, or 26 trucks or buses and 65 cars per trip. As a result of negotiations between the State and Hawaii Superferry, Inc., DOT concluded that several improvements to Kahului Harbor were necessary to accommodate the Superferry project, including the construction of a removable barge to Pier 2 of the harbor and other improvements to assist in Superferry operations. According to DOT, "[t]he state anticipates the barge will cost as much as $10 million," and the State of Hawaiʻi has allocated a total of approximately $40,000,000 in state funds for improvements to the four harbors that will be utilized by the Superferry project.

Appellants, consisting of two nonprofits and one unincorporated association, are environmental groups whose members use the area around Kahului harbor in various ways. The Sierra Club is one of the nation's largest environmental organizations, with over 700,-000 members, approximately 5,000 of which live in Hawaiʻi. The Sierra Club has a Hawaiʻi Chapter and a Maui group, which are involved in educating the public about Hawaii's natural resources through hikes, exploring wild places and natural resources, restoring and preserving eco-systems through service trips, and protecting open space through lobbying and litigation. Maui Tomorrow is described by a member as a "Maui island-wide environmental group which has participated in numerous environmental issues including but not limited to the environmentally sound growth of [ ] airport and harbor infrastructures." The Kahului Harbor Coalition is "an organization of farm-

5. The application was for a "Certificate of Public Convenience and Necessity" to operate as a water carrier of passengers and property, which was granted by the PUC on December 30, 2004. In its decision and order, the PUC deferred the issue of environmental review, stating:

> We believe that although these are important issues that should be addressed, they need not be addressed in this particular decision and order, since the determination of whether the proposed ferry service and its effects on the harbors and surrounding areas require an environmental assessment is currently being re-

> viewed and addressed by the DOT, and the legislature has determined that this Application should be processed expeditiously.

The PUC further "condition[ed its] authorization in this docket upon Applicant's showing, to the satisfaction of the commission, that Applicant has complied with all applicable federal and state laws, rules and regulations, including, without limitation, matters relating to the Environmental Impact Statement Law ("EIS"), under Chapter 343 HRS, to the extent applicable to ensure that all such requirements are appropriately addressed."

ers, businessmen, recreational users and citizens formed out of concern about the increased risks of alien species introductions through Kahului Harbor."

Appellants challenge, pursuant to HRS § 343-7(a) (1993), DOT's determination that the improvements to Kahului Harbor to accommodate the Superferry project are exempt from the requirements of HEPA, thus obviating the need for an EA.

## A. The Hawai'i Environmental Policy Act

HEPA, which was patterned after the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321-4370(f) (2000), was passed into law in 1974, 1974 Haw. Sess. L. Act 246, and codified in HRS chapter 343. The law requires that EAs and environmental impact statements (EIS) be prepared for development projects that meet certain criteria. According to A Guidebook for the Hawaii State Environmental Review Process, a publication of the Office of Environmental Quality Control (OEQC),

> the law requires that government give systematic consideration to the environmental, social and economic consequences of proposed development projects prior to allowing construction to begin. The law also assures the public the right to participate in planning projects that may affect their community.

Office of Environmental Quality Control, State of Hawai'i, A Guidebook for the Hawaii State Environmental Review Process 6

(2004) [hereinafter Guidebook], available at http://www.state.hi .us/health/oeqc/publications/guidebook.pdf.

The basic framework of HEPA consists of various stages of assessment by the proposing or accepting agency, each of which may entail additional review procedures.

First, it must be determined whether a project or program[6] is subject to the environmental review process in the first place. Projects are subject to the law if they (1) are either initiated by a government agency ("agency actions") or by a private party who requires government approvals for the project to proceed ("applicant actions"), and (2) propose one or more of nine enumerated land uses or administrative acts, known as "triggers." See HRS § 343-5(a)(1)-(9); Guidebook, supra, at 9. If a triggering event occurs, an EA must be prepared, unless the program or project is declared exempt.

Exemption determinations are governed by HRS § 343-6(7) (1993), which delegates to the Environmental Council[7] the responsibility to "adopt, amend, or repeal" rules which shall "[e]stablish procedures whereby specific types of actions, because they will probably have minimal or no significant effects on the environment, are declared exempt from the preparation of an assessment." HRS § 343-6(7). The exemption rules provide for ten classes of exempt action, specified in HAR § 11-200-8(A)(1)-(10) (1996), available at htt p://www.state.hi.us/

---

6. The statute specifies that environmental assessments shall be required for certain "actions." See HRS § 343-5 (Supp.2004). An "action" is defined under HEPA to mean "any program or project to be initiated by any agency or applicant." HRS § 343-2 (Supp.2004). Therefore, the subject of an EA may be variously described as an action, a project, or a program.

An important preliminary step in assessing whether an "action" is subject to environmental review is defining the action itself. This can be particularly relevant when the project under consideration consists of a "group of actions." HEPA regulations provide that

A group of actions proposed by an agency or an applicant shall be treated as a single action when:
 1. The component actions are phases or increments of a larger total undertaking;
 2. An individual project is a necessary precedent for a larger project;

 3. An individual project represents a commitment to a larger project; or
 4. The actions in question are essentially identical and a single statement will adequately address the impacts of each individual action and those of the group of actions as a whole.

Hawai'i Administrative Rules (HAR) § 11-200-7 (1996).

7. The Environmental Council is composed of fifteen members appointed by the Governor, and is charged with rulemaking for various parts of HEPA. See generally HRS §§ 341-3(c), -6; HAR chapter 11-201, "Environmental Council Rules of Practice & Procedure, available at http://www. state.hi.us/health/about/rules/11-201.html. The various rules it has adopted make up HAR title 11, chapter 200, "Environmental Impact Statement Rules" [hereinafter "EIS Rules"].

health/about/rules/11–200.html.[8] Agencies are also directed to develop their own lists of specific types of actions that fall within the exempt classes, which are reviewed by the Environmental Council and must be "consistent with both the letter and intent expressed in the exempt classes [of the EIS Rules] and chapter 343." HAR § 11–200–8(D).

An agency may declare an action exempt from the preparation of an EA provided that the agency obtains the advice of "other outside agencies or individuals having jurisdiction or expertise as to the propriety of the exemption." HAR § 11–200–8(A). The exemption classes do not apply when "the cumulative impact of planned successive actions in the same place, over time, is significant, or when an action that is normally insignificant in its impact on the environment may be

significant in a particularly sensitive environment." HAR § 11–200–8(B). The exemption process is discussed in more detail *infra*, in Section II.C.

When no exemption applies and one of the triggers of HRS § 343–5(a) is met, environmental review begins with the development of a draft EA. *Guidebook, supra* at 6. An EA, defined in HRS § 343–2, is an informational document prepared by either the agency proposing an action or a private applicant, which is used to evaluate the possible environmental effects of a proposed action. *Id.* It must give a detailed description of the proposed action or project and evaluate direct, indirect, and cumulative impacts, as well as consider alternatives to the proposed project and describe any measures proposed to minimize potential impacts. *Id.* Once

---

**8.** HAR § 11–200–8(A) provides:

Chapter 343, HRS, states that a list of classes of actions shall be drawn up which, because they will probably have minimal or no significant effect on the environment, may be declared exempt by the proposing agency or approving agency from the preparation of an environmental assessment provided that agencies declaring an action exempt under this section shall obtain the advice of other outside agencies or individuals having jurisdiction or expertise as to the propriety of the exemption. Actions declared exempt from the preparation of an environmental assessment under this section are not exempt from complying with any other applicable statute or rule. The following list represents exempt classes of action:

1. Operations, repairs, or maintenance of existing structures, facilities, equipment, or topographical features, involving negligible or no expansion or change of use beyond that previously existing;
2. Replacement or reconstruction of existing structures and facilities where the new structure will be located generally on the same site and will have substantially the same purpose, capacity, density, height, and dimensions as the structure replaced;
3. Construction and location of single, new, small facilities or structures and the alteration and modification of the same and installation of new, small, equipment and facilities and the alteration and modification of same, including, but not limited to:
 a. Single-family residences less than 3,500 square feet not in conjunction with the building of two or more such units;

b. Multi-unit structures designed for not more than four dwelling units if not in conjunction with the building of two or more such structures;
 c. Stores, offices, and restaurants designed for total occupant load of twenty persons or less per structure, if not in conjunction with the building of two or more such structures; and
 d. Water, sewage, electrical, gas, telephone, and other essential public utility services extensions to serve such structures or facilities; accessory or appurtenant structures including garages, carports, patios, swimming pools, and fences; and, acquisition of utility easements;
4. Minor alterations in the conditions of land, water, or vegetation;
5. Basic data collection, research, experimental management, and resource evaluation activities which do not result in a serious or major disturbance to an environmental resource;
6. Construction or placement of minor structures accessory to existing facilities;
7. Interior alterations involving things such as partitions, plumbing, and electrical conveyances;
8. Demolition of structures, except those structures located on any historic site as designated in the national register or Hawaii register as provided for in the National Historic Preservation Act of 1966, Public Law 89–665, 16 U.S.C. § 470, as amended, or chapter 6E, HRS;
9. Zoning variances except shoreline setback variances; and
10. Continuing administrative activities including, but not limited to purchase of supplies and personnel-related actions.

completed, the public has thirty days to review and comment on a draft EA. After the draft EA is finalized and public comments responded to, the agency proposing or approving the action reviews the final EA to determine if any "significant" environmental impacts are anticipated. If the agency determines that there will be no significant environmental impact, it issues a finding of no significant impact (FONSI), allowing the project to proceed without further study, although a FONSI determination may be challenged. However, if the agency determines that an action may have a significant impact, a more detailed EIS must be prepared. EIS preparation begins with a notice and comment period to define the scope of the draft EIS. Following this, the EIS is prepared in draft form by the proposing agency or applicant and becomes finalized after review by public and government agencies and a period for public comment and response. The final EIS must then be accepted, by the Governor or Mayor for agency actions, and by the approving agency for applicant actions. Once the EIS is accepted, the action may be implemented. *Id.*

HEPA provides for judicial review at various stages of the process: (1) when no EA is prepared, (2) an agency determines that an EIS will or will not be required, and (3) when an EIS is accepted. HRS § 343–7(a)–(c).

## B. *The Project*

### 1. **Harbor Improvements**

In addition to the certificate of public convenience and necessity received by the PUC, Superferry also received a "letter of intent" from the Harbors Division of DOT, dated December 9, 2004, which outlines the general terms, arrangements, and conditions of a formal agreement that DOT intended to enter with Superferry.[9] The letter sets out the terms for use of state harbors by Superferry as well as any equipment used at the harbor; fees, charges, and rents to be paid to the State by Superferry; various improvements to the harbors that the State "deem[ed] necessary to accommodate the start up" of Superferry's operations, and which will be the responsibility of DOT; and various provisions related to indemnification, insurance, the assignment of rights or obligations under the agreement, termination of the agreement, the agreement's term, and other matters.

As eventually determined by DOT, the Superferry project requires the following improvements at Kahului Harbor, the locus of Appellants' HEPA challenge: (1) the construction and utilization of a removable barge (floating platform) that will be moored at Pier 2 to provide a platform between the vessel and the pier for passenger loading and off loading, and which will be configured with a removable ramp for safe vehicle loading and off loading and (2) operational support to accommodate the Superferry project, which will include (a) the provision of utility services (water, power, and lighting) on or adjacent to the pier; (b) security fencing; (c) pavement striping; (d) the placement of boarding gangway ramps; and (e) the installation of tents at inspection points or customer waiting areas.[10] Several of these improvements are also proposed in the "Facility Layout Study" prepared for Hawaii Superferry by outside consultants and dated November 22, 2004.

Sometime after 1997, DOT prepared a document known as the Kahului Harbor 2025 Master Plan ("Master Plan"). Pursuant to a directive in the EIS Rules, DOT also developed a draft EA, dated June 2004, for the "proposed short-term improvements" at the Kahului Harbor identified in the Master Plan, also described as "those improvements which will be necessary within the next ten

---

9. The final agreement is not in the record. In the State's answer, it stated that the State "admits that it and HSF [Superferry] presently intend to execute an operating Agreement" but denied that it had been executed as of the filing of the answer, on April 19, 2005. However, in a March 2, 2005 letter to the chair of the Hawai'i Senate Committee on Transportation and Government Operations, Hawaii Superferry's CEO referred to an "operating agreement" between the company and the State. *See infra* Section I.B.3.

10. According to Appellants, "HDOT and the Hawai'i Superferry have steadfastly refused to make public any actual written plans or map plans showing in detail how each harbor will be used."

(10) years." The draft EA, which precedes the letter of intent, makes no reference to the Hawaii Superferry project and does not include an analysis of the improvements associated with it.[11] As both parties attest, the draft EA has not yet been made into a final EA.

## 2. DOT's Exemption Determination

Prior to its exemption determination, DOT had consulted with OEQC regarding whether an exemption from the environmental review process was appropriate for the proposed improvements. In a letter to Genevieve Salmonson dated November 15, 2004, Fukunaga stated that DOT "request[s] confirmation from the [OEQC] that the intended improvements fall within the approved Exemption Classes Established for the State Department of Transportation." In a reply letter dated November 23, 2004, and with the subject "Hawaii Superferry Improvements," Salmonson wrote that "OEQC believes that the proposed improvements fall within the scope of work described in the Department of Transportation's approved exemption list." Salmonson's letter states OEQC's "under-

stand[ing]" that DOT would take the following actions with respect to Kahului Harbor: "DOT plans to demolish a portion of one side of the tip of pier 2 to create a notch in the pier. DOT has received comments on the master plan EA for Kahului Harbor." The letter continues by stating that "[t]he above actions generally fall under exemption class 6 number 8 and exemption class 8 number 1 of DOT's approved exemption list dated November 15, 2000."[12] The letter also states that OEQC "believes that minor projects that have independent utility may be declared exempt even though an on-going environmental assessment may not have been finalized." Salmonson concluded her letter by stating "[a]ccordingly, we believe that the Department of Transportation has authority to declare the actions described above as exempt from the requirement to prepare an environmental assessment."

DOT also sent identical letters to two agencies regarding the Kahului Harbor, the Department of Public Works and Waste Management for the County of Maui and the Department of Planning for the County of Maui, expressing its intention to proceed

11. The draft EA makes clear that it is limited to the "proposed project," which "only includes those short-term projects recommended in the DOT–HAR Kahului Commercial Harbor 2025 Master Plan." These projects include the "Pier 1 extension (Pier 1D)," "Pier 1 comfort stations and sewer line," "Pier 3 expansion," "new pier 4," "new Pier 2C extension, including a passenger terminal, roadway and bridge," and "structural pavement, access bridge and utilities at 'Puunene Yard.'" The "Proposed Project Description" section of the draft EA also contained the following:

The projects will maintain Harbor operations based on the existing and forecast maritime demands for cargo and passengers. Other projects contained in the 2025 Master Plan may or may not be completed, and due to the long-range nature of these intermediate and long-term projects, the projects are not yet ripe for decision making. Therefore, in the future, as these projects become ripe for decision making, environmental analyses will be performed prior to design in order to determine what, if any, additional environmental documentation is required.

However, Appellees take inconsistent positions with respect to whether the harbor improvements are part of the Master Plan. In its reply memorandum in support of its motion to dismiss

or for summary judgment, Hawaii Superferry, Inc. refers to "[t]he 'action' that DOT is assessing" as "certain Kahului Commercial Harbor improvements *identified in its Master Plan.*" (Emphasis added.) DOT, however, in the reply memorandum in support of its motion, states that "the minor changes at issue are not part of the master plan."

12. Although DOT, in its exemption determination letter, expressly relied on exemption class 6 number 8, *see infra*, it did not refer to exemption class 8 number 1 cited by Salmonson in her letter on behalf of OEQC. That exemption provides as follows:

EXEMPTION CLASS 8: Demolition of structures, except those structures located on any historic site as designated in the National Register or Hawaii Register as provided for in the National Historic Preservation Act of 1966, Public Law 89–655, or Chapter 6E, Hawaii Revised Statutes.

1. Demolition of existing structures under Department of Transportation jurisdiction except seawalls and other coastal structures and those structures located on any historic site as designated in the National Historic Preservation Act of 1966, Public Law 89–655, or Chapter 6E, Hawaii Revised Statutes.

with the Superferry project, as well as explaining the contemplated improvements and soliciting comments.

On February 23, 2005, in a letter to OEQC Director Salmonson, DOT expressed its determination that "the operation of Hawaii Superferry at Kahului Harbor ... meets conditions that permit exemption from environmental review at such location based on the method of operation planned." The letter described the action under review as "the requirements and needs associated with harbor access and use of pier facilities by Hawaii Superferry Inc., at Kahului Harbor on the Island of Maui." It set forth its decision as follows:

> Following discussions with Hawaii Superferry and consultation with State and County agencies regarding the intended use of the harbor facility and in consideration of the provisions of Chapter 343, Hawaii Revised Statutes, and Chapter 11–200, Hawaii Administrative Rules, we have determined that the operation of Hawaii Superferry at Kahului Harbor conforms with the intended use and purpose of the harbor and meets conditions that permit exemption from environmental review at such location based on the method of operation planned. The ferry activity at Kahului Harbor will use equipment appropriate for a harbor, include only minor facilities improvements and will be conducted at an existing pier facility that is consistent with the purpose and reason for which it was originally developed.

DOT also noted that

> The installation and result of the minor improvements noted will not produce or create any adverse air quality, noise or water quality impact. All changes, modifications, additions or adjustments remain compatible with the uses established for the harbor and its piers, fall within maritime activities that were identified in environmental reviews conducted in conjunc-

tion with the original development of the facilities and conform to the purpose for which the harbor was built.

DOT explained the legal basis of this decision [13] as follows:

> Pursuant to chapter 343, Hawaii Revised Statutes, and chapter 11–200, Hawaii Administrative Rules, the Department of Transportation has determined that the subject property will have minimal or no significant effect on the environment and is therefore exempt from the preparation of an environmental assessment. The determination is based on the following Exemption Classes as listed on the *Comprehensive Exemption List for the State of Hawaii Department of Transportation amended November 15, 2000.*[14] The applicable exemption classes are as follows:
>
> > *Exemption Class 3:* Construction and location of single, new, small facilities or structures and the alteration and modification of same and installation of new, small, equipment and facilities and the alteration and modification of the same including but not limited to:
> >
> > > Item 3. Installation of security and safety equipment.
> >
> > *Exemption Class 6:* Construction or placement of minor structures accessory to existing facilities.
> >
> > > Item 8. Alteration or addition of improvements with associated utilities, which are incidental to existing harbor and boat ramp operations, in accordance with master plans that have met the requirements of Chapter 343, Hawaii Revised Statutes. Such improvements and associated utilities include concessions, comfort stations, pavilions, paving, rock walls, fencings, walkways, loading docks, warehouses, piers, offices, container freight stations, cranes, fuel lines, lighting, sprinkler and drainage system.

---

13. As noted by Appellants, "[t]he exemption determinations do not disclose the size or the scope of the Hawai'i Superferry project."

14. The exemption list prepared by DOT is a seven-page document that lists more specific examples for each of the exempt classes of action delineated in HAR 11–200–8. *See* DOT, Comprehensive Exemption List for the State of Hawaii Department of Transportation (Nov. 15, 2000), http://www. state.hi.us/health/oeqc/exemptions/sdot1100.pdf.

Before this determination, the County councils of Maui, Kaua'i, and Hawai'i each adopted Resolutions recognizing potential adverse impacts of the Superferry and calling for the preparation of an EIS to address and mitigate these impacts. Various other individuals, including Superintendent Donald W. Reeser, of the Haleakalā National Park, National Park Service; the Maui Invasive Species Committee; and the Pacific Whale Foundation, expressed similar views to government officials.

### 3. Hawaii Superferry's Representations Regarding Superferry Operations

In March 2005, John L. Garibaldi, CEO of Hawaii Superferry, Inc., submitted a letter to the Chair of the Hawai'i Senate Committee on Transportation and Government Operations, urging the Senator to oppose a Senate Bill that would have required Hawaii Superferry, Inc. to prepare an EIS for the Superferry. In the letter, Garibaldi discussed plans undertaken by Hawaii Superferry, Inc. and DOT and expressed his view that "Hawaii Superferry complies with all Hawaii and Federal environmental regulations."

The letter specifically addresses plans regarding the environment, stating:

> Under the terms of an operating agreement with the State of Hawaii, Hawaii Superferry will submit detailed operational plans prior to the commencement of services to the Harbors Division. The operational plans will cover all aspects of the interisland ferry service operations and will be jointly prepared by Hornblower Marine Services, Inc., the ferry's operator, and CH2MHill, Inc., consulting engineers. Harbor Divisions will require that the operational plans cover operations at each harbor, *including topics bearing on the environment* such as schedules, *procedures for security screening and agricultural inspection ... hazardous material handling, ...* and *traffic control,* as well as pier and dock usage policies and procedures in general, relating to Hawaii Superferry and other harbor users and harbor employees. In addition to the requirements of Harbors Division, the operational plans will cover other environmental topics of utmost importance to Hawaii Superferry such as *alien pest species, whale avoidance* and *traffic impacts,* among others.

(Emphases added.) Garibaldi also discussed his company's work with "the State Department of Agriculture, environmental and community groups to develop [Hawaii Superferry's] environmental policies." Garibaldi further attested that Hawaii Superferry "ha[s] policies in place ... to help stop the migration of alien species." Lastly, the letter stated that Hawaii Superferry's "whale avoidance policy is much stricter than what is required by federal regulations" and that Hawaii Superferry is "committed to ... procedures in mitigating the movement of invasive species and ensuring the safety of marine mammals. . . ."

### C. *Procedural History*

On March 21, 2005, Appellants, by complaint, sought a determination that an EA must be prepared for the Hawaii Superferry project and challenged the exemption determinations made by DOT. The first amended complaint, styled as a complaint "for declaratory, injunctive and other relief," was based on the relevant HEPA section, HRS § 343–7; the declaratory judgment statute, HRS § 632–1;[15] and article XI, section 9 of the Hawai'i State Constitution.[16] Appellants' first amended complaint presented the following claims for relief: (1) that an EA, at a minimum, is required; (2) that the Hawaii Superferry project must be incorporated into the ongoing EA for Kahului Harbor Improvements; (3) that the exemptions are illegal, void, or voidable; (4) that an EA must be prepared at the earliest practicable time and may not be deferred until after decision-making; and (5) that any approval granted

15. Although an affirmative statute of limitations defense was not raised, we note that the lawsuit was filed on March 21, 2005, which was "within one hundred twenty days of the agency's decision to carry out or approve the action," HRS § 343–7(a), taking the date of that decision as February 23, 2005, when DOT officially determined that the harbor improvements would be exempt from the requirements of HEPA.

16. Article XI, section 9 of the Hawai'i State Constitution is discussed *infra,* in Section III.A.1.b.

without the required EA is void as a matter of law.

In addition to a determination regarding each of these claims, Appellants prayed that the court, among other things: (1) issue a mandatory injunction or stay ordering DOT and Superferry "either to abandon the proposed project or to prepare an EA that fully complies with Chapter 343"; (2) issue a "temporary restraining order, preliminary injunction, and permanent injunction and/or stay" that would "[r]estrain[ ] [DOT and Superferry] from proceeding with the short-term Harbor improvement and/or the Hawaii Superferry project, from implementing the projects in any way, from seeking or granting any further approvals for the projects, or from selecting any particular alternatives . . . until and unless an acceptable EA is prepared."

On May 12, 2005, DOT filed a "motion to dismiss or, in the alternative, for summary judgment," in which it argued that Appellants lacked standing, and that the State was entitled to dismissal or summary judgment on the merits, because DOT's determination was correct and should be accorded deference. On the same date, Superferry filed a similar motion, in which it argued that: (1) "plaintiff's first amended complaint must be dismissed as a matter of law," on the general grounds of standing and that the court lacked subject matter jurisdiction over Count II of Appellants' first amended complaint and (2) that "summary judgment in favor of Hawai'i Superferry should be granted as a matter of law," because DOT followed proper procedures in making its exemption determination, that its substantive determination was proper, and that Plaintiffs' claims that the exemptions are "illegal, void or voidable" are without basis. The matter was heard on July 6, 2005.

On July 12, 2005, the circuit court issued an order granting both motions, and made the following findings relevant to this appeal:

1. Plaintiffs lack standing to pursue the claims in their First Amended Complaint for Declaratory, Injunctive and Other Relief filed April 1, 2005 . . ., and all counts of the First Amended Complaint are therefore dismissed.

2. In the alternative, assuming Plaintiffs have standing, summary judgment is granted as Defendant State of Hawai'i Department of Transportation complied with Chapter 343 of the Hawaii Revised Statutes.

3. With regard to Count II of Plaintiffs' First Amended Complaint, to the extent Count II alleges a claim relating to the Draft Environmental Assessment for the Kahului Commercial Harbor Improvements dated June 2004, such a claim is premature and therefore dismissed.

4. Plaintiffs' request for a continuance is insufficient pursuant to Rule 56(f) of the Hawaii Rules of Civil Procedure and is therefore denied.

Final judgment was entered on the same day. This timely appeal followed. Oral argument for this case was held on August 23, 2007.

On that day, we issued an order reversing the July 12, 2005 circuit court judgment, holding that DOT's determination that the improvements to the Kahului Harbor, on the Island of Maui, are exempt from the requirements of HRS chapter 343 was erroneous as a matter of law. We further instructed the circuit court to enter summary judgment in favor of Appellants on their claim as to the request for an EA.

While we remanded this case to the circuit court, we retained concurrent jurisdiction to enter an opinion and judgment.

## II. STANDARDS OF REVIEW

A. *Motion to Dismiss and/or Motion for Summary Judgment*

A circuit court's ruling on a motion to dismiss is reviewed *de novo*. *Bremner v. City & County of Honolulu,* 96 Hawai'i 134, 138, 28 P.3d 350, 354 (App.2001). Likewise, we review the circuit court's grant or denial of summary judgment de novo. *Hawai'i Community Federal Credit Union v. Keka,* 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000).

In this case, DOT and Superferry each filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. Although the court, in its order, treated some of Appel-

lants' claims as dismissed, because it also stated that summary judgment was granted, and was presented with matters outside of the pleadings that it did not exclude, this court should treat the motion, for purposes of review, as one for summary judgment. HRCP Rule 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."). *See also Hall v. State,* 7 Haw.App. 274, 280, 756 P.2d 1048, 1053 (1988) ("[S]ince in deciding the Motion To Dismiss, which was entitled alternatively as a motion for summary judgment, matters outside the pleading were considered by the lower court, the court really granted summary judgment under Rule 56, HRCP, and not a dismissal under Rule 12(b)(6), HRCP.").

### B. *Motion for Summary Judgment*

 The standard for granting a motion for summary judgment is settled:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Id.* (citations and internal quotation marks omitted).

*Coon v. City and County of Honolulu,* 98 Hawai'i 233, 244–45, 47 P.3d 348, 359–60 (2002) (second alteration in original).

*Kau v. City and County of Honolulu,* 104 Hawai'i 468, 474, 92 P.3d 477, 483 (2004).

### C. *Review of Agency Exemption Determinations*

#### 1. Which Standard Should Apply

The parties dispute the standard of review and level of deference to the agency's determination that should apply in this case.

The circuit court granted summary judgment, in the alternative, because it concluded that DOT "complied with" HEPA. This is a legal conclusion. In order to prevail, Appellants must show that this conclusion was erroneous as a matter of law, either because there were material facts in dispute which bear on the question of DOT's compliance with HEPA, or because, based on undisputed facts, DOT did not comply with HEPA. However, our law is not settled on the standard of review that the circuit court should have applied to the agency determination, and that we should apply when assessing DOT's exemption determination in our *de novo* review of the circuit court's judgment.

Appellants argue that the exemption determinations should be reviewed as a matter of law, because the issue presented is whether the agency has complied with the applicable statutory and regulatory mandates. They argue that DOT is not entitled to deference in its exemption determination, for two reasons: (1) because this case was brought as an original action and did not arise from a contested case, citing *Hawaii's Thousand Friends v. City and County of Honolulu,* 75 Haw. 237, 248, 858 P.2d 726, 732 (1993) (stating that "[t]herefore, the circuit court was not required to defer to the DLU's determination on the potential environmental impact of the park project ... [but] could make its own independent findings regarding the salient facts of the instant case") [17]; and (2)

---

17. The court in *Hawaii's Thousand Friends* went on to apply the clearly erroneous standard of review to the circuit court's factual finding, in that case, "that the overall park project may have a significant environmental impact," in variance with DLU's contrary conclusion. 75 Haw. at

because following *Paul's Electrical Service, Inc. v. Befitel,* 104 Hawai'i 412, 91 P.3d 494 (2004), deference is only applied when "the legislature [has] empowered the agency with discretion to make a particular determination," *id.* at 417, 91 P.3d at 499, and the applicable statutes and rules "do[ ] not include any language providing agencies with any discretion in making exemption determinations." [18]

■ Although Appellees agree that whether DOT complied with HEPA is a legal question, they argue that the circuit court and this court should give deference to the determinations of OEQC and DOT with regard to the exemption at issue. They argue that our review should be limited to whether DOT "followed all proper procedures in making and issuing the exemption determination," which they interpret as the requirement, in HAR § 11–200–8, that agencies declaring an action exempt "obtain the advice of other outside agencies or individuals having jurisdiction or expertise as to the propriety of the exemption." [19] They further argue that if the court finds that such procedures were

followed, we should give deference to DOT's and OEQC's determination regarding the propriety of the exemptions based on *Paul's Electrical Service,* because the legislature, they claim, "authorized OEQC to define the parameters of HEPA," and DOT followed those rules when making its determination.[20] Appellees also cite to *Lee v. Elbaum,* for the proposition that "[a]n administrative agency's interpretation of its own rules is entitled to 'deference unless it is plainly erroneous or inconsistent with the underlying legislative purpose,'" 77 Hawai'i 446, 457, 887 P.2d 656, 667 (App.1993) (quoting *Int'l Bhd. Of Elec. Workers, Local 1357 v. Hawaiian Tel. Co.,* 68 Haw. 316, 323, 713 P.2d 943, 950 (1986)), and *Obayashi Hawaii Corp.,* for the proposition that "[t]he court does not wish to substitute its judgment for that of an agency within the executive branch of government...." 81 Hawai'i at 182 n. 12, 914 P.2d at 1375 n. 12.

■ HEPA does not provide direct guidance as to what standards of review should apply to an agency's determination that a project is exempt from the preparation

248, 858 P.2d at 732. However, in this case the circuit court made no factual determinations to which the clearly erroneous standard of review might apply. Rather, the question is what standard of review should apply to the *agency's* determination in the first instance. Because in this case we review, *de novo,* the circuit court's legal conclusion that DOT complied with HEPA, we must first determine what standard the circuit court should have applied to the agency's determination.

18. Appellants also argue that DOT has a duty to take a "hard look" at environmental factors in making exemption determinations, a standard drawn from federal law that was cited in *Price v. Obayashi Hawaii Corp.,* 81 Hawai'i 171, 182 n. 12, 914 P.2d 1364, 1375 n. 12 (1996) (quoting *Stop H–3 Ass'n v. Lewis,* 538 F.Supp. 149, 159 (D.Haw.1982)). *See infra* Section III.B.2.c.

19. Later in their brief, Appellees argue that "the issue before this Court is not the propriety of the exemption (i.e. whether DOT's decision was right or wrong), but whether the Circuit Court properly found that DOT followed all proper procedures in making its determinations."

20. Appellees' assertion mischaracterizes the role of OEQC. OEQC was created by HRS § 341–3 to "implement" HRS chapter *341,* to "perform its duties under chapter 343 [HEPA]," and to "serve the governor in an advisory capacity on

all matters relating to environmental quality control." HRS § 341–3 (1993). The director of OEQC "shall have such powers delegated by the governor as are necessary to coordinate and, when requested by the governor, to direct pursuant to chapter 91 all state governmental agencies in matters concerning environmental quality," HRS § 341–4(a), and has specific responsibilities specified in HRS § 341–4(b).

OEQC's "duties under" HEPA are set out mainly in HRS chapter 343–3, "Public records and notice," and include: (1) making available for public inspection all statements, EAs, and other documents prepared under HEPA, HRS § 343–3(a) (Supp.2004); (2) informing the public of notices filed by agencies regarding the availability of EAs for review and comments, determinations that EISs are or aren't required, the availability of EISs for review and comments, and the acceptance or nonacceptance of statements, HRS § 343–3(b); (3) informing the public of specific public processes or hearings related to the federal Endangered Species Act, HRS § 343–3(c); and (4) publishing a periodic bulletin containing the aforementioned notices, HRS § 343–3(d).

Therefore, while OEQC has a significant role in the implementation of HEPA, it does not "define [its] parameters," as Appellees assert. Rather, the Environmental Council is entrusted with that role through its rulemaking powers. *See supra* note 7.

of an EA.[21] Therefore, this court must decide which standard of review to apply. Based on this review of the statutory framework and our caselaw, we conclude that the appropriate standard of review depends on the specific question under consideration. In general, agency exemption determinations that involve factual questions should be reviewed under a clearly erroneous standard. *Del Monte Fresh Produce (Hawaii), Inc. v. Int'l Longshore and Warehouse Union, Local 142*, 112 Hawai'i 489, 499, 146 P.3d 1066, 1076 (2006) ("A[n agency's] conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." (Internal quotation and brackets removed.)). However, as discussed below, whether or not an agency has followed proper procedures or considered the appropriate factors in making its determination is a question of law, and will be reviewed *de novo*. *Cf. id.* ("[U]nder HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6).").

### 2. The Factors that Agencies Making Exemption Decisions Must Consider

The exemption authority derives from HRS § 343–6(7), which states that the Environmental Council "shall adopt, amend, or repeal necessary rules . . . which shall . . . (7) Establish procedures whereby specific types of actions, because they will probably have minimal or no significant effects on the environment, are declared exempt from the preparation of an assessment." HRS § 343–6(7). Pursuant to this statute, the Environmental Council promulgated a rule governing exemption determinations: HAR § 11–200–8, "Exempt Classes of Action." *See supra* note

8. The rule sets out ten exempt classes of action, and specifies that a proposing or approving agency may declare an action exempt, "provided that" the agency "shall obtain the advice of other outside agencies or individuals having jurisdiction or expertise as to the propriety of the exemption," and the action falls within one of the exempt classes specified in the rule. Before making this determination, an agency must make a preliminary conclusion to determine whether a "group of actions" should be "treated as a single action," based on HAR § 11–200–7. Additionally, HAR 11–200–8(B) specifies that "all exemptions . . . are inapplicable when the cumulative impact of planned successive actions in the same place, over time, is significant, or when an action that is normally insignificant in its impact on the environment may be significant in a particularly sensitive environment." HAR § 11–200–8(B). Lastly, HAR § 11–200–8(D) directs agencies to develop their own lists of "specific types of actions which fall within the exempt classes," which require approval of the Environmental Council and must be "consistent with both the letter and intent expressed in the exempt classes [of the EIS Rules] and chapter 343." HAR § 11–200–8(D). DOT has developed its own exemption list. *See supra* note 13.

Therefore, an agency considering whether an action is exempt must make the following determinations: (1) whether the action being considered is part of a "group of actions" which must be "treated as a single action," HAR § 11–200–7; (2) whether it falls within an exempt class of action, either under its own list developed pursuant to HAR § 11–200–8(D) or that set out in HAR § 11–200–8(A); and (3) whether the exemption is inapplicable because of the cumulative impact of an action or its impact on a particularly sensitive environment. In addition to these determinations, an agency must comply with the requirement that it seek advice.

---

**21.** This case is not a secondary appeal under HRS chapter 91, but was brought as an original action under HRS § 632–1 and HRS § 343–7(a), which provides for judicial proceedings, "the subject of which is the lack of assessment required under section 343–5." HRS § 343–7(a). While we may still draw from the standards of review set out in HRS § 91–14(g), *see In re*

*Robert's Tours & Transp., Inc.*, 104 Hawai'i 98, 102, 85 P.3d 623, 627 (2004) ("[W]e see no reason why the standards of review for an agency decision should differ depending on whether the appeal arises from a contested or a noncontested case—assuming that the court has jurisdiction to hear the appeal."), the question here is *which* of the various standards should apply.

■ There is a fourth, additional determination that is implied from the legislative and rule-based framework. HRS § 343–6(7) delegated to the Environmental Council the authority to make exemption rules for actions "because they will probably have minimal or no significant effects on the environment." The Environmental Council, in HAR § 11–200–8(D), directed other agencies to develop lists of specific types of actions, "as long as these lists are consistent with both the letter and intent expressed in these exempt classes and chapter 343, HRS." Moreover, EIS regulations define "exempt classes of action" as "exceptions from the requirements of chapter 343, HRS, to prepare environmental assessments, for a class of actions, *based on a determination by the proposing agency or approving agency that the class of actions will probably have a minimal or no significant effect on the environment.*" HAR § 11–200–2. In other words, an agency making an exemption determination must, at least implicitly, determine that the action will "probably have minimal or no significant effects on the environment"—not merely that it fits the description of the exemption category.

■ This approach is consistent with our caselaw. In *Kahana Sunset Owners Ass'n v. County of Maui*, 86 Hawai'i 66, 947 P.2d 378 (1997), this court examined the decision of the Maui County planning commission to grant a special management area (SMA) use permit to a developer without requiring an EA. The development, a 312–unit multi-family residential development on the island of Maui, required the SMA use permit to install a drainage line beneath a public road that would connect it to an exist-

ing culvert beneath the highway. *Id.* at 68, 71, 947 P.2d at 380, 383. In analyzing whether the HEPA exemption applied, this court stated that the "exemption approved by the council ... must be consistent with both the letter and the intent contained within the administrative rule exemption." [22] *Id.* at 71, 947 P.2d at 383. Having established that "[i]t is apparent from the context of the exemptions that the regulations intend to exempt only very minor projects from the ambit of HEPA," the court concluded that installation of the new drainage system was "qualitatively incompatible with the types of projects contained in" the exemption list, and therefore "inconsistent with both the letter and intent of the administrative regulations." *Id.* at 72, 947 P.2d at 384. Therefore, *Kahana Sunset Owners Ass'n* makes clear that not only must the exemption list be developed with regard to the letter and intent of HEPA and its regulations, but so also must individual exemption determinations.[23] The agency must make a preliminary determination that the action to be declared exempt is a "minor project" that will "probably have minimal or no significant effects on the environment." This conclusion is further supported by OEQC's *Guidebook,* which, in a sample exemption memo entitled "Declaration of Exemption," suggests use of the following statement: "I have considered the potential effects of the above listed project as provided by Chapter 343, HRS and Chapter 11–200, HAR. I declare that this project will probably have minimal or no significant effect on the environment and is therefore exempt from the preparation of an environmental assessment." [24]

22. Appellants make an analogous argument, that HEPA exemptions should be narrowly construed, based on the "well settled rule of statutory construction that exceptions to legislative enactments must be strictly construed." *State v. Russell,* 62 Haw. 474, 480, 617 P.2d 84, 88 (1980). This suggestion to narrowly construe exceptions is consistent with the requirement that exemptions be consistent with the letter and intent of HEPA.

23. Although this court's review in *Kahana Sunset Owners Ass'n* was made pursuant to HRS chapter 91, as a secondary appeal of the planning commission's decision, its analysis of exemption determinations is not limited to that context.

24. It should be emphasized that, as this sample memo suggests, the preliminary determination is only a cursory one, and falls far short of the requirements for preparing an EA, which are set out in HAR § 11–200–10. In most cases the fact that an action to be declared exempt will probably have only minimal environmental affects should be obvious.

We therefore do not give much credit to Appellees' argument that "Appellants would have this Court believe that a full EIS of the entire project needs to be prepared each time an exemption is declared under HEPA." The question is not the level of documentation required, but what factors must be considered in making a determination.

### 3. Whether Courts Should Defer to Agency Exemption Determinations

Regarding the question of deference, our caselaw instructs that we do not apply "deference" per se, but may choose a more or less deferential standard of review.[25] We have applied the "abuse of discretion" standard only after determining that the legislature intended that a decision be a matter of discretion. In applying that standard, we analyze whether the exercise of "discretion" is within the boundaries of discretion established by the legislature, as well as the more direct question of whether the bounded discretion was abused. *See Paul's Elec. Serv.*, 104 Hawai'i at 417, 91 P.3d at 499.

 As review of the HEPA statutory framework makes clear, blind deference to agency exemption determinations is not appropriate. An agency making an exemption determination must make four determinations (defining the action, whether it fits into an exempt class, whether an exclusion to the exemption applies, and whether the exemption is consistent with the letter and intent of HEPA because it will "probably have minimal or no significant effects on the environment"), and comply with the procedural consultation requirement. Although these determinations may involve factual questions, the final conclusion that an action is exempt is a legal one. Moreover, whether or not an agency has followed the correct procedures or considered the appropriate factors in making its determination is a question of law. Therefore, a reviewing court must determine whether the agency's factual determinations were clearly erroneous, and

Moreover, although Appellees cite various cases in support of their argument that documentation of an exemption decision may be short, their quotations are selective. In *Wilderness Watch v. Mainella*, the court, in addition to stating that "[d]ocumentation of reliance on a categorical exclusion ... need only be long enough to indicate to a reviewing court that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did," 375 F.3d 1085, 1095 (11th Cir.2004), also approvingly cited a Ninth Circuit case suggesting that documentation should "show that the agency considered the environmental consequences of its action and decided to apply a categorical exclusion to the facts of a particular decision." *Id.* (quoting *California v. Norton*, 311 F.3d 1162, 1175 (9th Cir.2002)). It is clear that the determinative question is not the level of the documentation of an exemption decision, but whether it shows that the appropriate factors were considered.

**25.** Although this has been a point of contention on this court, all of our opinions are in accord with the view that when we speak of deference, it is usually in regard to the fact that the "abuse of discretion" standard is *more deferential*, for example, than the *"de novo"* standard. As Justice Acoba has written,

It is not clear how a "deferential" abuse of discretion standard differs from the "abuse of discretion" standard as listed in HRS § 91–14(g). Similarly, it is not apparent how affording 'deference' adds anything more to the fact that the agency must make clear findings of fact and conclusions of law.

. . . .

The "deference" to be given agency decisions already inheres in the specific enumerated grounds.

*In re Water Use Permit Applications*, 105 Hawai'i 1, 28, 93 P.3d 643, 670 (2004) (Acoba, J., concurring) (citations omitted). The confusion, it seems, stems from the phrase "deferential abuse of discretion" standard. This phrase is perhaps misleading, as the standard speaks for itself, and has been separately interpreted in our caselaw with a specific meaning. Thus we have said that discretion is a "flexible" concept, and that:

A strong showing is required to establish an abuse [of discretion], and each case must be decided on its own facts.... The most commonly repeated definition was first articulated in *State v. Sacoco* [, 45 Haw. 288, 292, 367 P.2d 11, 13 (1961)]: "[G]enerally, to constitute an abuse it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." This definition is appropriate because it highlights the great deference appellate courts generally give to discretionary decisions, and conveys the high burden of arbitrariness or caprice which an appellant must meet to overcome that deference.

*Paul's Elec. Serv.*, 104 Hawai'i at 419, 91 P.3d at 501 (alteration in original) (quoting Michael J. Yoshii, *Appellate Standards of Review in Hawaii*, 7 U. Haw. L.Rev. 273, 292–93 (1985)).

However, while characterizing the abuse of discretion standard as "deferential," we have never suggested that there is an additional "deferential abuse of discretion" standard. *See id.* ("A 'high burden,' a 'heavy burden,' and 'deference' are all ways of expressing this same concept: that a determination made by an administrative agency acting within the boundaries of its delegated authority will not be overturned. unless 'arbitrary, or capricious, or characterized by ... [a] clearly unwarranted exercise of discretion.' ").

whether it otherwise complied with HEPA and its implementing regulations, as a matter of law.

Although HAR § 11–200–8 makes an exemption determination discretionary, *see* HAR § 11–200–8 ("actions ... *may* be declared exempt ...."), the rule delegating exemption decisions to the proposing or accepting agency was made by the Environmental Council. This delegation was not made by the legislature. *See Paul's Elec. Serv.*, 104 Hawai'i at 417, 91 P.3d at 499 ("[I]f a *statute* does not grant an agency discretion with which to interpret or implement that statute, then that agency's legal conclusions will be reviewed de novo." (Emphasis added.)). Moreover, while OEQC may have discretion in various areas of its expertise, it has no statutory role in reviewing exemption determinations to which this court must defer. *See supra* note 20. Exemption determinations made by proposing or accepting agencies should therefore be reviewed as a matter of law, under the standards elaborated above.[26] *Cf. Citizens Against Reckless Development v. Zoning Bd. of Appeals of Honolulu*, 114 Hawai'i 184, 194–95, 159 P.3d 143, 153–54 (2007) ("By empowering agencies generally with the authority to adopt rules regarding the manner in which declaratory ruling petitions shall be considered and disposed of, the legislature has granted agencies discretion with regard to the consideration of declaratory rulings ... [but t]he boundaries of that discretion ... are established ... by reading the statute and the agency rules in tandem."). *See also Paul's Elec. Serv.*, 104 Hawai'i at 417–18, 91 P.3d at 499–500 ("The boundaries of an agency's discretion are established by the legislature ... and these statutory boundaries will likely assist a reviewing court in defining 'discretion' when the court examines an agency's action for an abuse of discretion."); *Director, Dep't of Labor and Indus. Relations v. Kiewit Pacific Co.*, 104 Hawai'i 22, 32, 84 P.3d 530, 540 (Hawai'i App.2004) ("The key to especial deference to an agency's interpretation of its own rules and regulations, then, is the agency's legislative prerogative and the expertise it acquires, in promulgating as well as enforcing its own rules and regulations.").

## III. DISCUSSION

### A. Standing

Appellants assert that they have standing in this case based on two grounds: (1) traditional injury in fact and (2) "procedural" standing. As discussed *infra*, our caselaw has endorsed both theories. We believe that Appellants have established standing based on either theory, and herein review both grounds.

#### 1. The Law of Standing

##### a. general principles of standing

■ "Standing is concerned with whether the parties have the right to bring suit." *Pele Defense Fund v. Puna Geothermal Venture*, 77 Hawai'i 64, 67, 881 P.2d 1210, 1213 (1994)

....

■ "It is well settled that the crucial inquiry with regard to standing is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his or her invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on his or her behalf." *In re Application of Matson Navigation Co. v. Federal Deposit Ins. Corp.*, 81 Hawai'i 270, 275, 916 P.2d 680, 685 (1996).

---

**26.** California courts employ *de novo* review when reviewing exemption determinations under their similar statute, the California Environmental Quality Act (CEQA), Cal. Pub. Res.Code §§ 21000–21177. *See Santa Monica Chamber of Commerce v. City of Santa Monica*, 101 Cal. App.4th 786, 792, 124 Cal.Rptr.2d 731, 736 (Cal. Ct.App.2002) ("In reviewing City's determination that the legislation fell within a categorical exemption to CEQA review, the task of the trial court was, and ours is, to determine whether, *as a matter of law*, the legislation met the definition of a categorically exempt project ... [i]n other words, we apply a de novo standard of review...." (Citations omitted.)); *Centinela Hosp. Ass'n v. City of Inglewood*, 225 Cal.App.3d 1586, 1599, 275 Cal.Rptr. 901, 910 (Cal.Ct.App.1990) ("The scope of an exemption provided by statute is a question of statutory interpretation and also one of law. In reviewing the trial court's ruling, the appellate court has an independent function, and need not defer to the trial court's ruling." (Quotation signals omitted.)).

*Mottl v. Miyahira,* 95 Hawai'i 381, 389, 23 P.3d 716, 724 (2001) (quoting *Akinaka v. Disciplinary Bd. of Hawai'i Supreme Court,* 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999)).

 To determine whether a plaintiff has the requisite stake, we employ a three-part standing test, requiring that the plaintiff satisfy the following questions in the affirmative:

(1) has the plaintiff suffered an actual or threatened injury ...;[27] (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury.

*Mottl,* 95 Hawai'i at 389, 23 P.3d at 724.

 The standing doctrine described above is based on this court's prudential rules of judicial self-governance. As this court stated in *Life of the Land v. Land Use Commission,* 63 Haw. 166, 623 P.2d 431 (1981):

Though the courts of Hawaii are not subject to a "cases or controversies" limitation like that imposed upon the federal judiciary by Article III, § 2 of the United States Constitution, we nevertheless believe judicial power to resolve public disputes in a system of government where there is a separation of powers should be limited to those questions capable of judicial resolution and presented in an adversary context. *Reliable Collection Agency, Ltd. v. Cole,* 59 Haw. 503, 510, 584 P.2d 107, 111 (1978). For "prudential rules" of judicial self-governance "founded in concern about the proper and properly limited role of courts in a democratic society" are always of relevant concern. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). *See also Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 221–27, 94 S.Ct. 2925, 2932–35, 41 L.Ed.2d 706 (1974). And even in the absence of constitutional restrictions, courts still carefully weigh the wisdom,

efficacy, and timeliness of an exercise of their power before acting, especially where there may be an intrusion into areas committed to other branches of government. In short, judicial intervention in a dispute is normally contingent upon the presence of a "justiciable" controversy. *See State v. Maxwell,* 62 Haw. 556, 562, 617 P.2d 816, 820 (1980); *Wong v. Board of Regents,* 62 Haw. 391, 394–95, 616 P.2d 201, 203–05 (1980) and cases cited therein; *Schwab v. Ariyoshi,* 58 Haw. 25, 37, 564 P.2d 135, 142–43 (1977); *Territory v. Tam,* 36 Haw. 32, 35 (1942).

*Id.* at 171–72, 623 P.2d at 438.

 However, in addition to this court's judicially-developed standing rules, this court must take guidance from applicable statutes or constitutional provisions regarding the right to bring suit. *See id.* at 172 & n. 5, 623 P.2d at 438 & n. 5 (stating that "standing requisites ... may also be tempered, or even prescribed, by legislative and constitutional declarations of policy," and citing to the declaratory judgment statute, HRS chapter 632, and the Hawai'i Constitution, article XI, section 9, Environmental Rights).

We have also stated on many occasions that the "touchstone" of this court's notion of standing is "the needs of justice," *id.* at 176, 623 P.2d at 441, *cited in Mottl,* 95 Hawai'i at 389–90, 23 P.3d at 724–25, and that "standing requirements should not be barriers to justice." Rather, quoting the words of Professor Kenneth Culp Davis, we have endorsed the view that "[o]ne whose legitimate interest is in fact injured by illegal action of an agency or officer should have standing because justice requires that such a party should have a chance to show that the action that hurts his interest is illegal." *Mahuiki v. Planning Commission,* 65 Haw. 506, 512–13, 654 P.2d 874, 878 (1982) (alteration in original) (quoting *East Diamond Head Ass'n v. Zoning Board of Appeals,* 52 Haw. 518, 523

27. The original quote included the additional phrase "as a result of the defendant's wrongful conduct." However, because the second prong deals with causation, or the "traceability" of the injury to the defendant's actions, there is no need to include this element within the first prong, which focuses on the nature of the injury asserted by the plaintiff. *See Public Access Shoreline*

*Hawaii v. Hawai'i County Planning Comm'n,* 79 Hawai'i 425, 434 n. 15, 903 P.2d 1246, 1255 n. 15 (1995) ("The necessary elements of an 'injury in fact' include: 1) an actual or threatened injury, which 2) is traceable to the challenged action, and 3) is likely to be remedied by favorable judicial action." (Emphasis omitted.)).

n. 5, 479 P.2d 796, 799 n. 5 (1971) (quoting Kenneth C. Davis, *The Liberalized Law of Standing,* 37 U. Chi. L.Rev. 450, 473 (1970))).

b. *standing in environmental cases generally*

■ As this court has recognized, "the appellate courts of this state have generally recognized public interest concerns that warrant the lowering of standing barriers in ... cases ... pertaining to environmental concerns." *Mottl,* 95 Hawai'i at 393, 23 P.3d at 728 (citing cases). *See also Citizens for Prot. of North Kohala Coastline v. County of Hawai'i,* 91 Hawai'i 94, 100–01, 979 P.2d 1120, 1126–27 (1999) ("[W]here the interests at stake are in the realm of environmental concerns[,] 'we have not been inclined to foreclose challenges to administrative determinations through restrictive applications of standing requirements.' " (Quoting *Mahuiki v. Planning Comm'n,* 65 Haw. at 512, 654 P.2d at 878.) (Bracketed comma in original.)). In *Sierra Club v. Hawai'i Tourism Authority,* Justice Acoba described the manner in which standing requirements have been eased in such cases, as composed of three transitions in the law:

this court's opinions have [(1)] moved "from 'legal right' to 'injury in fact' as the ... standard ... for judging whether a plaintiff's stake in a dispute is sufficient to invoke judicial intervention[,]" *Life of the Land v. Land Use Comm'n,* 63 Haw. 166, 174, 623 P.2d 431, 439 (1981), [(2)] from "economic harm ... [to inclusion of] '[a]esthetic and environmental well-being' " as interests deserving of protection, *In re Hawaiian Elec. Co.,* 56 Haw. 260, 265 n. 1, 535 P.2d 1102, 1105 n. 1 (1975) (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)), and [(3)] to the recog-

nition that "a member of the public has standing to ... enforce the rights of the public even though his [or her] injury is not different in kind from the public's generally, if he [or she] can show that he [or she] has suffered an injury in fact[.]" *Akau v. Olohana Corp.,* 65 Haw. 383, 388, 652 P.2d 1130, 1134 (1982).

100 Hawai'i 242, 251, 59 P.3d 877, 886 (2002) (plurality opinion) (alterations in original, except for addition of bold numbers). Therefore, environmental plaintiffs must meet the three-part standing test, described above, although there will be no requirement that their asserted injury be particular to the plaintiffs, and the court will recognize harms to plaintiffs environmental interests as injuries that may provide the basis for standing.

The less rigorous standing requirement this court applies in environmental cases draws support from the Hawai'i Constitution, article XI, section 9. Entitled "Environmental Rights," that section states

Each person has the right to a clean and healthful environment, as defined by laws relating to environmental quality, including control of pollution and conservation, protection and enhancement of natural resources. Any person may enforce this right against any party, public or private, through appropriate legal proceedings, subject to reasonable limitations and regulation as provided by law.

Haw. Const., art. XI, § 9, *cited in Life of the Land,* 63 Haw. at 171 n. 5, 623 P.2d at 438 n. 5 *and Hawai'i Tourism Auth.,* 100 Hawai'i at 276, 59 P.3d at 911 (Moon, J., dissenting); *see also* Avis K. Poai, Recent Developments, *Hawai'i's Justiciability Doctrine,* 26 U. Haw. L.Rev. 537, 563 n. 214 (2004) (stating that "the most persuasive argument for environmental standing is that it has been constitutionally recognized," and citing article XI, section 9, of the Hawai'i Constitution).[28]

---

**28.** Although this court has cited this amendment as support for our approach to standing in environmental cases, *see, e.g. Life of the Land,* 63 Haw. at 177 n. 15, 623 P.2d at 443 n. 15, we have not directly interpreted the text of the amendment. *But see Bremner,* 96 at 145 n. 3, 28 at 361 n. 3 ("The manner in which Bremner's rights under article XI may be enforced, however, is governed by section 9's qualification that

any such legal proceeding be 'subject to reasonable limitations and regulation as provided by law.' Haw. Const. art. XI, § 9. Because Hawai'i Revised Statutes ch. 343 provides reasonable limitations and regulations for adjudicating disputes involving environmental assessments, Bremner's failure to comply with its provisions forecloses further consideration of his constitutional claim."). Because the HEPA statute has

### c. *standing in HEPA cases: substantive and procedural*

 Because "standing requisites [may be] prescribed [ ] by legislative ... declarations of policy," *Life of the Land,* 63 Haw. at 172, 623 P.2d at 438, it is important to examine the HEPA statute in order to determine whether and in what fashion it modifies the standing inquiry outlined above. Based on the statute and our caselaw, we conclude that HRS § 343–7 grants a plaintiff standing to sue either on the basis of a traditional injury in fact or on the basis of a procedural injury.

### i. "injury" in general .

 Of critical importance in assessing whether a plaintiff has standing to sue is assessing the nature of the injury alleged, as each element of the standing test depends on the theory of injury presented by the plaintiff and adopted by the court. *See Cmty. Treatment Ctrs. v. City of Westland,* 970 F.Supp. 1197, 1208 (E.D.Mich.1997) ("[T]he resolution of a standing question often depends on how the court characterizes the alleged injury.").

 Furthermore, although a plaintiff may be injured in any number of ways, the injury prong of the standing inquiry requires an assertion of a judicially-cognizable injury, that is, a harm to some legally-protected interest. *See Bremner,* 96 Hawai'i at 140, 28 P.3d at 356 ("[A] plaintiff's 'personal stake' in the outcome of a controversy *may arise from a defendant's infringement of personal or special interests* that is separate and distinct from the traditional basis of infringement of legal rights or privileges." (Emphasis added.) (Citing *Life of the Land,* 63 Haw. at 172–77, 623 P.2d at 438–41.)); *Hawai'i Tourism Auth.,* 100 Hawai'i at 251, 59 P.3d at 886 (plurality opinion) ("This court's opinions have moved from 'legal right' to 'injury in fact' as the ... standard ... for judging whether a plaintiff's stake in a dispute is sufficient to invoke judicial intervention." (Quotation signals removed.)). *Cf. Raines v. Byrd,* 521 U.S. 811, 819, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) ("We have also stressed that the alleged injury must be legally and judicially cognizable."); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("First, the plaintiff must have suffered an 'injury in fact'—*an invasion of a legally protected interest ....*" (Emphasis added.)); 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3531.2, at 922 (Supp.2007) ("The injury element of constitutional standing requirements may be denied, despite a showing of injury in fact, if the injury is not 'judicially cognizable.' ").

This court has recognized a variety of interests that, if injured, can form the basis for standing. In environmental cases, injuries to recreational and aesthetic interests have been acknowledged as forming the basis for a plaintiff's standing. *See, e.g., Akau v. Olohana Corp.,* 65 Haw. 383, 390, 652 P.2d 1130, 1135 (1982) (finding that plaintiffs had standing to bring class action to enforce rights-of-way along once public trails to the beach that crossed defendants' property because "difficulty in getting to the beach hampers the use and enjoyment of it and may prevent or discourage use in some instances"); *Citizens for Prot. of North Kohala Coastline,* 91 Hawai'i at 101, 979 P.2d at 1127 (holding that citizen group had standing to challenge agency's issuance of special management area permit for construction of coastline resort because the group's members, although not owning land adjoining the project area, were "long time and frequent users" of the coastline, for such uses as fishing, "picnics, ... swimming and boating," and therefore "injury to its members' quality of life is threatened"); *Pele Def. Fund v. Puna Geothermal Venture,* 77 Hawai'i 64, 70, 881 P.2d 1210,

specific language regarding who may enforce the law, and the parties have not discussed the constitutional provision in their appellate briefs, further discussion of the meaning of article XI, section 9 of the Hawai'i Constitution is not warranted. *See also Kahana Sunset Owners Ass'n v. Maui County Council,* 86 Hawai'i 132, 134, 948 P.2d 122, 124 (1997) (citing to legislative history of HRS § 607–25, in which the legislature made reference to the constitutional amendment, stating that "[t]he legislature finds that article XI, section 9, of the Constitution of the State of [Hawai'i] has given the public *standing* to use the courts to enforce laws intended to protect the environment" (alteration in original) (emphasis added)).

1216 (1994) (finding that Pele Defense Fund, which had appealed the grant of certain permits to the geothermal venture, "clearly demonstrated an 'injury in fact' " based on its assertion of "potential harm including diminished property values, deterioration of air quality, odor nuisance, and possible physical injury resulting from the permitted operations"). In addition, although plaintiffs must show that some environmentally-related interest was injured, the ultimate inquiry depends on injury to the plaintiffs themselves, not the environment. *See, e.g., Hawai'i Tourism Auth.,* 100 Hawai'i at 271, 59 P.3d at 906 (Moon, J., dissenting) (stating that organizational plaintiff must show that its *"plaintiff members*—not the environment— have been or will be harmed"); *id.* at 251 n. 15, 59 P.3d at 886 n. 15 (plurality opinion) (stating that "actual or threatened injury is that set forth in the affidavits of Petitioner's members," but evaluating the claim of harm to the environment as a means of assessing whether Plaintiffs suffered an actual or threatened injury); *cf. Friends of the Earth, Inc. v. Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff.").

### ii. "procedural injury"

A majority of our court has also recognized the concept of "procedural injury" as a basis for standing.[29] *See Hawai'i Tourism Auth.,* 100 Hawai'i at 265, 59 P.3d at 900 (Nakayama, J., concurring) ("Procedural standing is appropriate for cases alleging violations of HRS Chapter 343."); *id.* at 272, 59 P.3d at 907 (Moon, J., dissenting, joined by Levinson,

J.) ("[A]ny alleged injury resulting from HTA's purported failure to follow the provisions of chapter 343 is in the nature of a 'procedural' injury."). This subset of standing doctrine-known as "procedural standing"-derives from footnote seven of the United States Supreme Court's opinion in *Lujan,* in which the Court stated that "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." 504 U.S. at 572 n. 7, 112 S.Ct. 2130.[30] The procedural standing doctrine was recently reaffirmed by the United States Supreme Court in *Massachusetts v. Environmental Protection Agency,* —— U.S. ——, ——, 127 S.Ct. 1438, 1441, 167 L.Ed.2d 248 (2007) ("[A] litigant to whom Congress has 'accorded a procedural right to protect his concrete interests,'—here, the right to challenge agency action unlawfully withheld—'can assert that right without meeting all the normal standards for redressability and immediacy.' " (Citations omitted.) (Quoting *Lujan,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130.)).

Based on the statements in *Lujan,* federal courts have created various tests to determine whether a plaintiff has established standing based on a procedural injury. While these tests modify the manner in which the traditional three-part standing test is met, *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (three-part Article III standing test); *Mottl,* 95 Hawai'i at 389, 23 P.3d at 724 (three-part Hawai'i standing test), they still require that a plaintiff show an injury, which is fairly

---

**29.** In *Hawai'i Tourism Authority,* Justice Acoba wrote the plurality opinion, joined by Justice Ramil, in which they opined that the plaintiffs lacked standing and that "procedural standing" was not available under HEPA. The dissent, written by Chief Justice Moon and joined by Justice Levinson, would have found that plaintiffs had established standing based on the theory of "procedural standing." Justice Nakayama wrote the decisive concurrence, which endorsed the viability of "procedural standing" under HEPA, but concluded that plaintiffs had failed to establish standing under that theory under the specific facts of the case. Therefore, as discussed *infra,* despite the fact that standing was not established in *Hawai'i Tourism Authority,* the

legal avenue of establishing standing on the basis of a "procedural injury" under HEPA was endorsed by a majority of the members of the court.

**30.** In footnote eight of its opinion, the Court clarified that an individual can enforce procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." 504 U.S. at 573 n. 8, 112 S.Ct. 2130. This concrete interest requirement has been enmeshed in the procedural standing test as developed in other federal courts, discussed *infra.*

traceable to the defendant's actions, and which is redressable by court action.

Regarding the injury-in-fact requirement in procedural standing cases, the Ninth Circuit Court of Appeals, in a pre-*Lujan* case, stated that

The procedural injury implicit in agency failure to prepare an EIS—the creation of a risk that serious environmental impacts will be overlooked—is itself a sufficient 'injury in fact' to support standing, provided this injury is alleged by a plaintiff having a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have.

*City of Davis v. Coleman,* 521 F.2d 661, 671 (9th Cir.1975).[31] Later, in *Douglas County v. Babbitt,* 48 F.3d 1495 (9th Cir.1995), *cert. denied,* 516 U.S. 1042, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996), the Ninth Circuit incorporated the United States Supreme Court's statements in *Lujan,* and boiled procedural standing down to "two essential elements": that the person seeking suit on the basis of a procedural injury[32] (1) is a "person who has been accorded a procedural right to protect [his or her] concrete interests and (2) . . . has some threatened concrete interest that is the ultimate basis of [his or her] standing." *Id.* at 1500, *cited in Hawai'i Tourism Auth.,* 100 Hawai'i at 274, 59 P.3d at 909 (Moon, J., dissenting). Furthermore, the Ninth Circuit held that the concrete interest "must be within the zone of interests NEPA was designed to protect," *id.* at 1501, and explained that a "concrete interest" could be demonstrated by showing that a plaintiff has a "geographic nexus" to the site of the challenged project. *Id.* at 1500 n. 5. *See also Citizens for Better Forestry v. U.S. Dep't of*

*Agric.,* 341 F.3d 961, 971 (9th Cir.2003) ("In NEPA cases, we have described [the] 'concrete interest' test as requiring a 'geographic nexus' between the individual asserting the claim and the location suffering an environmental impact." (Quoting *Public Citizen v. Dep't of Transp.,* 316 F.3d 1002, 1015 (9th Cir.2003)).). The Tenth Circuit has framed the procedural standing inquiry in a similar way, stating that:

An agency's failure to follow the National Environmental Policy Act's prescribed procedures creates a risk that serious environmental consequences of the agency action will not be brought to the agency decisionmaker's attention. The injury of an increased risk of harm due to an agency's uninformed decision is precisely the type of injury the National Environmental Policy Act was designed to prevent. Thus, under the National Environmental Policy Act, an injury of alleged increased environmental risks due to an agency's uninformed decisionmaking may be the foundation for injury in fact under Article III.

*Comm. to Save the Rio Hondo v. Lucero,* 102 F.3d 445, 448–49 (10th Cir.1996). The Tenth Circuit has also described the additional requirement of showing a threat to one's concrete interests as necessary to show that a "plaintiff [is] among the injured." *Id.* at 449. *See also Hawai'i Tourism Auth.,* 100 Hawai'i at 276, 59 P.3d at 911 (Moon, J., dissenting) ("[A] particular plaintiff must be among the injured.").

In more recent cases, the Ninth Circuit has required that plaintiffs seeking "to show a cognizable injury in fact . . . must allege . . . that (1) the agency violated certain procedural rules; (2) these rules protect a plain-

---

**31.** This formulation, which focuses on risk, is similar to that proposed by Chief Justice Moon in *Hawai'i Transit Authority* for evaluating procedural injuries under HRS chapter 343. *See* 100 Hawai'i at 272, 59 P.3d at 907 ("[T]he alleged injury[, in a challenge to an agency's failure to conduct an EA,] is that the agency acts without considering potentially 'significant effects' of the environmental consequences of its actions, irrespective of whether there is actual environmental harm.").

**32.** In *Douglas County,* the County had "assert[ed] that it has standing 'based upon its pro-

cedural injuries resulting from the [government's] failure to prepare an environmental document that explores a range of alternatives and cumulative effects.'" 48 F.3d at 1500. The County was challenging, under NEPA, the Secretary of the Interior's decision that it need not prepare an EA when it designated certain federal land as "critical habitat" for the Northern Spotted Owl. *Id.* at 1498–99. Therefore, the underlying procedural injury was the allegation that a procedural requirement of NEPA—conducting an EA—was not followed.

tiff's concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir.2004) (brackets omitted) (quoting *Citizens for Better Forestry*, 341 F.3d at 969–70).

■ Taken as a whole, these cases illustrate that although the requirements for asserting a cognizable procedural injury may be framed differently by different courts, at a minimum, a plaintiff must suffer some procedural wrong *as well as* a threat to underlying concrete interests. *See also Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th Cir.2005) ("A free-floating assertion of a procedural violation, without a concrete link to the interest protected by the procedural rules, does not constitute an injury in fact.").

With regard to other elements of the standing inquiry, the Ninth Circuit has stated that "[o]nce a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed." *Citizens for Better Forestry*, 341 F.3d at 975. The causation element concerns whether the asserted injury is fairly traceable to the defendant's actions, and thus it has been said that "[t]o establish causation, a plaintiff need only show its increased risk is fairly traceable to the agency's failure to comply with [NEPA]." *Comm. to Save Rio Hondo*, 102 F.3d at 452. *See also Citizens for Better Forestry*, 341 F.3d at 975 ("[C]ausation ... is only implicated where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant."); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1518 (9th Cir.1992) ("The causation question concerns only whether plaintiffs' injury is dependent upon the agency's policy, or is instead the result of independent incentives governing [a] third part[y's] decisionmaking process.").[33]

With regards to the redressability prong of the standing analysis, the Ninth Circuit has stated, in conjunction with other circuits, that a plaintiff "who asserts inadequacy of a government's environmental studies ... [n]eed not show that further analysis by the government would result in a different conclusion. It suffices that the agency's decision could be influenced by the environmental considerations that the relevant statute requires an agency to study." *Citizens for Better Forestry*, 341 F.3d at 976. *See also Massachusetts v. EPA*, 127 S.Ct. at 1453 ("When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 668 (D.C.Cir.1996) (en banc) (noting that procedural injuries are "easily redressable, as a court may order the agency to undertake the procedure.").

Although other federal circuit courts have developed different tests for procedural standing,[34] on the whole the various ap-

---

**33.** In *Hall v. Norton*, the Ninth Circuit stated that the causation requirement is satisfied if the plaintiff establishes a "reasonable probability" of a threat to the plaintiff's concrete interests. 266 F.3d 969, 976 (9th Cir.2001). However, the "reasonable probability" issue concerns whether an injury in fact has occurred, as later Ninth Circuit cases acknowledge by adopting that language from *Hall* as the third prong of the injury-in-fact test. *See also Comm. to Save Rio Hondo*, 102 F.3d at 451–52 ("Whether an increased risk will or will not occur due to the agency action determines whether a plaintiff has suffered injury in fact, not causation. Certainly, under the injury-in-fact prong, a plaintiff cannot merely allege that some highly attenuated, fanciful environmental risk will result from the agency decision; the risk must be actual, threatened or imminent. However, once the plaintiff has established the likelihood of the increased risk for purposes of injury in fact, to establish causation, as the Com-

mittee has here, the plaintiff need only trace the risk of harm to the agency's alleged failure to follow the National Environmental Policy Act's procedures.").

**34.** *See, e.g., Sierra Club v. Johnson*, 436 F.3d 1269, 1278 (11th Cir.2006) ("We conclude that a plaintiff has established procedural injury standing if he has established that the claimed violation of the procedural right caused a concrete injury in fact to an interest of the plaintiff that the statute was designed to protect."); *City of Dania Beach, Fla. v. Fed. Aviation Admin.*, 485 F.3d 1181, 1185 (D.C.Cir.2007) ("We have held that '[a] violation of the procedural requirements of a statute is sufficient to grant a plaintiff standing to sue, so long as the procedural requirement was designed to protect some threatened concrete interest of the plaintiff.'" (Alteration in original.) (Quoting *City of Waukesha v. EPA*, 320 F.3d 228, 234 (D.C.Cir.2003).)); *Bensman v. U.S.*

proaches demonstrate that the procedural standing doctrine is a means of accommodating the standing inquiry to the special circumstances created by injuries to statutory procedural rights.

 Therefore, in summary, three important features of the procedural standing doctrine may be noted: (1) it is based on a specific characterization of a plaintiff's injury, namely the denial of some procedures mandated by law; (2) whether there is a procedural injury in turn depends on whether the plaintiff has been accorded a procedural right, an analysis which by its nature focuses on the statutory framework in question; and (3) the plaintiff's procedural right must be coupled with an underlying concrete interest.

### iii. procedural standing under HRS § 343-7

There is procedural standing for members of the public under HEPA because it is a procedural statute that accords procedural rights. *See Life of the Land*, 63 Haw. at 172, 623 P.2d at 438 ("[S]tanding requisites ... may ... be tempered, or even prescribed, by legislative and constitutional declarations of policy.").

The specific HEPA provision at issue in this case is HRS § 343-7, entitled "Limitation on actions," subsection (a), which con-

cerns challenges to decisions not to provide an environmental assessment. That subsection provides:

> Any judicial proceeding, the subject of which is the lack of assessment required under section 343-5, shall be initiated within one hundred twenty days of the agency's decision to carry out or approve the action, or, if a proposed action is undertaken without a formal determination by the agency that a statement is or is not required, a judicial proceeding shall be instituted within one hundred twenty days after the proposed action is started. The council or office, any agency responsible for approval of the action, or the applicant shall be adjudged an aggrieved party for the purposes of bringing judicial action under this subsection. *Others, by court action, may be adjudged aggrieved.*

HRS § 343-7(a) (emphasis added).

With respect to standing, HRS § 343-7(a) differentiates two sets of parties with respect to their status as "aggrieved part[ies] for the purposes of bringing judicial action" under the subsection: (1) "[t]he council or office, any agency responsible for approval of the action, or the applicant," who "*shall* be adjudged an aggrieved party"; and (2) "others" who "*may* be adjudged aggrieved," "by court action." [35] As noted by the plurality in *Ha-*

---

*Forest Serv.*, 408 F.3d 945, 952–53 (7th Cir.2005) (endorsing procedural standing: "[u]nder *Lujan*, the deprivation of a purely procedural right can be remedied by a federal court only when the individual who has been deprived of that right can demonstrate that deprivation of that right is related to another concrete injury.").

35. Both the text and the legislative history of HRS § 343-7 indicate that it concerns "standing requisites." In its original version, as passed by the legislature in 1974, the reference to standing was explicit. The original "Limitation on Actions" section, which corresponds to HRS § 343-7 today, did not include any statements that could be construed to relate to standing for subsections (a) and (b), that is, judicial proceedings to challenge the lack of an EA or determinations regarding whether or not an EIS will be required. However, in the third subsection, concerning review of the "acceptability" of an EIS, the original law included the proviso that "only *affected agencies*, or *persons who will be aggrieved* by a proposed action and who provided written comments to such a statement during the designated review period shall have *standing* to file

suit." HRS § 343-6(c) (1976) (emphasis added) (current version at HRS § 343-7(c) (1993)). The report of the Senate Committee on Ecology, Environment and Recreation that considered the bill also demonstrates that the committee clearly viewed the "Judicial Review" section as dealing with standing concerns. Thus, the committee report described the effect of the amendment as "provid[ing] a citizen *standing to sue* only when he has previously been involved in the public review process of the environmental impact statement and when his comments at that time dealt with the issues described in the suit," and also stated that "[h]owever, his *standing* would be recognized after exhausting the existing remedies open to him as specified in Chapter 91." Sen. Comm. Rep. 956-74, in 1974 Senate Journal, at 1126–27.

Analogous sections regarding who may bring suit were added to subsections (a) and (b) in 1979, which allow pre-EIS challenges. Incidentally, at this time the legislature also eliminated the term "standing to sue" from Section 343-7(c), instead referring to those who "shall be adjudged aggrieved parties *for the purpose of*

*wai'i Tourism Authority,* "[t]he distinction drawn in HRS § 343–7(a) is between those named parties who could be said to have an unquestioned right of action and 'others,' who must show that they are *aggrieved in some way,* in a court action." 100 Hawai'i at 263, 59 P.3d at 898 (emphasis added).

Under procedural standing, the language of HRS § 343–7(a)—in particular the legislature's use of the unique phrase "may be *adjudged* aggrieved," [36]—may be viewed as suggesting that the legislature specifically intended that the determination of whether an "other" party is aggrieved in the requisite sense be left with the courts, once such a party has initiated a "court action." [37] Because standing in Hawai'i is a judicial rule of self-restraint, it has been the role of our courts in the first instance to determine the types of interests and injuries that give a party standing to sue. *See, e.g., Life of the Land,* 63 Haw. at 173, 174, 623 P.2d at 439 (stating that Hawai'i decisions "have paralleled, in substance, the evolution of federal doctrine," which has undergone a "transition from 'legal right' to 'injury in fact' as the federal standard in the realm of environmental concerns for judging whether a plaintiff's stake in a dispute is sufficient to invoke judicial intervention"). *See also Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund,* 500 U.S. 72, 77, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991) ("[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents."), *superseded on other grounds by statute,* Federal Courts Improvement Act of 1996, Pub.L. No. 104–317, § 206, 110 Stat. 3847, 3850; *Valley Forge College v. Americans United,* 454 U.S. 464, 492, 102 S.Ct. 752,

70 L.Ed.2d 700 (1982) (Brennan, J., dissenting) ("Neither 'palpable injury' nor 'causation' is a term of unvarying meaning. There is much in the way of 'mutual understandings' and 'common-law traditions' that necessarily guides the definitional inquiry."). Therefore, under the concept of procedural standing, an "other" party may demonstrate that it is "aggrieved" on the basis of a procedural injury.

There is evidence that the legislature may have understood HEPA to be procedural in nature, and thus affording a procedural right unto parties who seek to challenge nonconformity with its requirements. *See Fernandez v. Brock,* 840 F.2d 622, 629 (9th Cir.1988) ("[I]n order to determine whether Congress intended to create procedural rights from the imposition of statutory duties, we should look for evidence in the statutory language, the statutory purpose, and the legislative history."). Indeed, in *Hawai'i Tourism Authority* Justice Nakayama stated that "federal courts' construction of procedural standing is appropriate as applied to HEPA because, similar to its federal counterpart, NEPA, HEPA sets forth various requirements that are inherently procedural." *Hawai'i Tourism Auth.,* 100 Hawai'i at 266, 59 P.3d at 901 (Nakayama, J., concurring). The inherently procedural nature of HEPA's requirements was amply demonstrated in Justice Nakayama's concurrence:

> The main thrust of HEPA is to require agencies to consider the environmental effects of projects before action is taken. It does so by providing a procedural mechanism to review environmental concerns. HRS § 343–1 (1993). The legislature ex-

*bringing judicial action under this subsection."* 1979 Haw. Sess. L. Act 197, § 8, at 412–13 (emphasis added). However, there is no relevant legislative history on these changes, as major changes of the 1979 law focused on other areas—the remainder being characterized by the Senate Committee Report as "primarily housekeeping changes." Sen. Comm. Rep. 628, in 1979 Senate Journal, at 1264.

Therefore, although the legislative history of HRS § 343–7 is not particularly enlightening with respect to *what* standing requirements must be fulfilled in order for a party to bring judicial action under HEPA, the legislative history does clearly indicate that the subsection is directed at the question of standing to sue.

36. The plurality noted in *Hawai'i Tourism Authority* that the phrase "[o]thers, by court action may be adjudged aggrieved" is sui generis, not appearing in any other state or federal statute. 100 Hawai'i at 263 n. 31, 59 P.3d at 898 n. 31.

37. HRS § 343–7(a) may be read as indicating that the legislature did not intend to prescribe specific standing requirements, but merely wanted to ensure that "other" parties meet the minimal requirement of being "aggrieved," clarifying and distinguishing such parties from the named parties who would have an automatic right of action.

plained that HEPA provides an "environmental review process [that] will integrate the review of environmental concerns with existing planning processes of the State and counties and alert decision makers to significant environmental effects which may result from the implementation of certain actions." HRS § 343–1. One of the procedural tools of HEPA is an EA, which is used to determine circumstances under which a particular action will have a significant effect on the environment. HRS § 343–2 (Supp.2001). If the EA concludes that a significant impact is expected, an Environmental Impact Statement (EIS), among other things, must be prepared. HRS § 343–2; HRS § 343–5(b). If no significant effect is expected, the agency submits a draft EA that must be available for public comment and review. HRS § 343–5(b). ("Whenever an agency proposes an action in subsection (a), . . . that agency shall prepare an environmental assessment for such action at the earliest practicable time to determine whether an environmental impact statement shall be required. For environmental assessments for which a finding of no significant impact is anticipated, a draft environmental assessment shall be made available for public review and comment for a period of thirty days."). Consequently, HEPA does not confer substantive rights or remedies. To insist that a prospective plaintiff demonstrate substantive standing pursuant to a statute that confers only procedural rights ignores the plain language of HRS § 343–7(a).

*Id.* at 266–67, 59 P.3d at 901–02 (Nakayama, J., concurring) (alterations in original) (footnotes omitted).[38] The dissent expressed a similar view of HEPA:

[T]he provisions of chapter 343 are procedural, not substantive—*i.e.* under chapter 343, the agency must consider the potential environmental consequences of its actions and allow public participation in the review process, but chapter 343 neither compels the agency to undertake, nor bars the

agency from undertaking, any particular substantive action.

*Id.* at 272, 59 P.3d at 907 (Moon, J., dissenting). The dissent concluded that "[a]ccordingly, any alleged injury resulting from HTA's purported failure to follow the provisions of chapter 343 is in the nature of a 'procedural' injury." *Id.*

Other parts of chapter 343 may be viewed as according a procedural right to members of the public. In the "Findings and purpose" section, the legislature states its finding that "the process of reviewing environmental effects is desirable because environmental consciousness is enhanced, cooperation and coordination are encouraged, and *public participation* during the review process benefits all parties involved and society as a whole." HRS § 343–1 (1993) (emphasis added). The definition of EIS describes that "[t]he initial statement [is] filed for public review" and that the final statement "is the document that has incorporated the public's comments and the responses to those comments." HRS § 343–2. A section entitled "Public records and notice" states that OEQC "shall inform the public of notices filed by agencies of the availability of environmental assessments for review and comments, of determinations that statements are required or not required, of the availability of statements for review and comments, and of the acceptance or nonacceptance of statements," and also includes specific notice requirements. HRS § 343–3. These sections, which provide for public notice and comment as to actions under HEPA's ambit, further suggest that HEPA accords a procedural right unto members of the public. *Cf. Douglas County*, 48 F.3d at 1501 ("The County has been 'accorded a procedural right' because NEPA provides that 'local agencies, which are authorized to develop and enforce environmental standards' may comment on the proposed federal action.").

By requiring that a party seeking to establish procedural standing also have an underlying concrete interest that is threatened—

38. In her opinion, Justice Nakayama distinguished "substantive standing," which referred to the injury-in-fact standing test, from "procedural standing," the test enunciated in *Lujan*. *See Hawai'i Tourism Auth.*, 100 Hawai'i at 266 n. 3, 59 P.3d at 901 n. 3.

and which has been called "the ultimate basis of its standing"—the court ensures that the standing requirement serves its purpose of ensuring that only parties who have suffered an injury may resort to the court system.[39] We now turn to whether Appellants have demonstrated sufficient injury to establish standing in this case.

### 2. Whether Appellants Have Established Standing

■ Appellants contend that the circuit court erroneously concluded that they lack standing, because they have adduced numerous declarations alleging harms they will suffer due to the Superferry project, and also because they meet the standards of procedural standing. Appellees Superferry and State of Hawai'i argue, in reply, that the circuit court properly found that Appellants failed to establish standing, for four substantive reasons[40]: (1) that the injuries claimed by Appellants "are purely speculative and do not rise to an actionable injury" and are in this regard "virtually identical" to the claimed injuries that were found insufficient to confer standing in *Hawai'i Tourism Authority*; (2) that Appellants have failed to establish that the alleged injuries are attributable to the harbor improvements or the Hawaii Superferry; (3) that Appellants have failed to establish that the alleged injury is likely to be remedied by a favorable decision, because "there is nothing in the record to indicat[e] that an alternative to air travel between islands would necessarily *increase*

any burdens on the Appellants' interests"; and (4) that Appellants do not qualify for "group standing" because the alleged injuries are personalized injuries that "are not injuries which were/will be suffered by the membership of the Sierra Club in general."

We agree that Appellants have established standing in this case and that *Hawai'i Tourism Authority* is distinguishable. Appellants have suffered both threatened injuries under either a traditional injury-in-fact test or procedural injuries based on a procedural right test. The threatened injury in fact is due to DOT's decision to go forward with the harbor improvements and allow the Superferry project to operate at Kahului harbor without conducting an EA. Similarly, the procedural injury is based on the various interests Appellants have identified that are threatened due to the violation of their procedural rights under HEPA. Appellants have also demonstrated that the threatened substantive injuries and procedural injuries were caused by Appellees and may be redressed by this court. *See Mottl*, 95 Hawai'i at 389, 23 P.3d at 724. Because the threatened injury in this case and the procedural injury are virtually the same, they are analyzed together.

#### a. *Appellants have established standing based both on injury in fact and procedural injury*

Appellants claim that DOT's approval of an exemption from the requirement to prepare an EA was in violation of HEPA, and caused

**39.** Indeed, as the Ninth Circuit has stated, "[t]he nature of the Article III standing inquiry is not fundamentally changed by the fact that ... [the party] asserts a 'procedural,' rather than 'substantive,' injury." *City of Sausalito*, 386 F.3d at 1197. Although our standing doctrines are not based on Article III of the United States Constitution, *see supra* Section III.A.1.a, the recognition of procedural injury similarly does not effect a fundamental change to a less-restrictive standing doctrine.

**40.** Contrary to Appellees' assertion, the phrase "adjudged aggrieved" does not present an additional procedural hurdle, beyond demonstrating that a party is "aggrieved," over which plaintiffs must jump.

Therefore, we disagree with the argument of Appellees Hawaii Superferry, Inc. and the State of Hawai'i, that Appellants' "fail[ure] to seek a finding by the Court that [they] were aggrieved

parties" is fatal to their case. In fact, we have interpreted the "adjudged" aspect of this phrase to mean no more than that a party "must show in a court action brought under § 343–7(a) that they are aggrieved and must be adjudged aggrieved, *in concert with a challenge* to the lack of an EA statement." *Hawai'i Tourism Auth.*, 100 Hawai'i at 262, 59 P.3d at 897 (plurality opinion) (emphasis added). No special finding is required—but a plaintiff must bear the burden of establishing standing as they would in any other matter. *See also Kepo'o v. Kane*, 106 Hawai'i 270, 285, 103 P.3d 939, 954 (2005) (finding that plaintiff-intervenors had standing to sue under HRS § 343–7(b), as they met the standing test and "the [lower] court apparently 'adjudged' [them] 'aggrieved' within the meaning of HRS § 343–7(b)" by allowing them to intervene in the case).

injury to Appellants' interests in the following ways: (1) potential adverse impacts to endangered species caused by high-speed ferries; (2) threatened increase in the introduction of alien species through the implementation of the Hawaii Superferry project; (3) adverse impacts to recreational interests of members who "use and enjoy Kahului Harbor for surfing, diving and canoeing"; and (4) adverse traffic impacts caused by the Hawaii Superferry project to members who are "regular vehicular users of Kaahumanu Avenue, near the Kahului harbor."

■ A threatened injury under the traditional injury-in-fact test may be shown based on direct personal interests in the site of a project coupled with concerns of actual injury should the project go forward without adequate environmental review. For example, in *Kepo'o*, this court found that the president of a homeowners' association and the association itself had standing to challenge, under HRS § 343-7(b), an EA that had been conducted for the proposed construction and operation of a cogeneration power plant and that had found no significant impact, thus obviating the requirement of an EIS. 106 Hawai'i at 284–85, 103 P.3d at 953–54. The Mauna Kea residential community, which was represented by the association, was located two miles away from a proposed power plant. *Id.* at 285, 103 P.3d at 954. The president and the association asserted that they had a "direct personal interest in whether the potential adverse environmental impacts of the proposed plant are thoroughly considered." *Id.* The president regularly

surfed and swam in the coastal waters near the proposed plant. Moreover, he and the association were "concerned that the proposed plant will (1) cause air and water pollution which in turn will injure their health and diminish property values and (2) attract heavy industry which could further aggravate these problems." *Id.* Based on these facts, we concluded: "[s]uch factors which would appear to satisfy an injury-in-fact requirement." *Id. See also Akau,* 65 Haw. at 388, 390, 652 P.2d at 1134, 1135 (holding "that a member of the public has standing to sue to enforce the rights of the public ... if he can show that he has suffered an injury in fact" by "demonstrat[ing] some injury to a recognized interest such as economic or aesthetic, and is himself among the injured and not merely airing a political or intellectual grievance").

■ In order to establish a procedural injury, in accord with both federal precedent and our caselaw, a plaintiff must show that: (1) the plaintiff has been accorded a procedural right, which was violated in some way, *see City of Sausalito,* 386 F.3d at 1197 (requiring that "the agency violated certain procedural rules"), *e.g.,* as here, a failure to conduct an EA; (2) the procedural right protects the plaintiff's concrete interests; and (3) the procedural violation threatens the plaintiff's concrete interests, thus affecting the plaintiff "personally," which may be demonstrated by showing (a) a "geographic nexus" to the site in question and (b) that the procedural violation increases the risk of harm to the plaintiff's concrete interests.[41]

---

**41.** This approach is consonant with that proposed by the dissent in *Hawai'i Tourism Authority. See* 100 Hawai'i at 282, 59 P.3d at 917 (Moon, J., dissenting). The "zone of interests" test proposed by the dissent is encompassed within the second prong, requiring that the procedural right, itself derived from statute, is meant to protect the concrete interests at issue. For example, several cases have used such a distinction to find that a plaintiff challenging an action on the basis of NEPA, or a state analogue, must show injury to some environmental interest, rather than a purely economic one. *See, e.g., Cmty. Pres. Corp. v. Miller,* 5 Misc.3d 388, 781 N.Y.S.2d 603, 607 (2004) ("[T]he presence of an economic motive alone does not constitute grounds for standing in a SEQRA [State Environmental Quality Review Act] action."); *Waste Mgmt. of Alameda County, Inc. v. County of*

*Alameda,* 79 Cal.App.4th 1223, 1229, 94 Cal. Rptr.2d 740 (2000) ("Waste Management's commercial and competitive interests are not within the zone of interests CEQA was intended to preserve or protect and cannot serve as a beneficial interest for purposes of the standing requirement.").

In addition, the Ninth Circuit's requirement that it be "reasonably probable that the challenged action will threaten the[ ] [plaintiffs'] concrete interests," *City of Sausalito,* 386 F.3d at 1197, which addresses the *likelihood* of harm to the underlying interests, is similar to the third prong's requirement that the procedural violation increase the risk of harm to a plaintiff's concrete interests. This requirement ensures that there is an actual threat to plaintiff's concrete interests. *See Hawai'i Tourism Auth.,* 100

As discussed above, HEPA accords procedural rights to members of the public and protects the types of interests we have recognized in past environmental cases, such as aesthetic and recreational interests and other environmental concerns. *See supra* Section III.A.1.c.i.

Therefore, the remaining question regarding either form of injury is whether Appellants' concrete interests were threatened by the decision to exempt the harbor improvements from the environmental review process. *See Hawai'i Tourism Auth.,* 100 Hawai'i at 251 n. 14, 59 P.3d at 886 n. 14 (plurality opinion) (stating that concrete interest requirement of procedural standing doctrine "is essentially encompassed in the injury-in-fact test").

By declaration, several of the members of the appellant groups have demonstrated a concrete interest based on a geographic nexus to the Kahului Harbor area. Karen Chun, a member of the Kahului Harbor Coalition, is the coach for a canoe club in Kahului Harbor. She has expressed concerns that the docking of the Superferry at the harbor—and the subsequent wait while cars unload—will impinge upon the outrigger canoe race course and training area, and also has concerns, as a driver, about increased traffic near the Harbor. Hannah Bernard, a Sierra Club member, is a marine biologist who has been "employed to study marine life including threatened and endangered marine species in the ocean waters in and around Maui including those waters through which the Hawaii Superferry would travel," and also enjoys watching marine life in those areas. Gregory Westcott is a member of the Kahului Harbor Coalition who surfs at Kahului Harbor and is "concerned about the effects of Hawaii Superferry upon the air and water quality in Kahului Harbor and the effects of expanded security zones on limiting access and use of Kahului Harbor as a surf site." Clearly, each of these members has demonstrated recreational and aesthetic interests in the Kahului Harbor area of the type we have recognized in past cases, and which bear a geographic nexus to the harbor. *E.g., Akau,* 65 Haw. at 390, 652 P.2d at 1135 (recognizing standing to enforce rights-of-way because "difficulty in getting to the beach hampers the use and enjoyment of it and may prevent or discourage use in some instances"); *Citizens for Prot. of North Kohala Coastline,* 91 Hawai'i at 101, 979 P.2d at 1127 (holding that citizen group had standing where members were "long time and frequent users" of the coastline, for such uses as fishing, "picnics, ... swimming and boating," and therefore "injury to its members' quality of life is threatened"); *Pele Def. Fund,* 77 Hawai'i at 70, 881 P.2d at 1216 (recognizing "potential harm including diminished property values, deterioration of air quality, odor nuisance, and possible physical injury resulting from the permitted operations"). *See also East Diamond Head Ass'n,* 52 Haw. at 521, 479 P.2d at 798–99 (1971) (holding that appellants had standing to challenge movie operation because "evidence of an increase in noise, traffic, and congestion ..., inconvenience by electrical and telephone work crews, and a fear that studio's facilities would permanently remain and detract from the aesthetic residential character of the neighborhood"); *Soc'y Hill Towers Owners' Ass'n v. Rendell,* 210 F.3d 168, 176 (3d Cir.2000) (holding that "[t]he Residents have alleged concrete and particularized injury in the form of increased traffic, pollution, and noise"); *Public Citizen,* 316 F.3d at 1016 (recognizing "evidence of a credible threat to the plaintiff's physical well-being from airborne pollutants [as] fall[ing] well within the range of injuries to cognizable interests that may confer standing," including such threats as increased traffic, pollution, noise, and auto emissions).

Other members of the appellant groups have demonstrated additional concrete inter-

Hawai'i at 281, 59 P.3d at 916 (Moon, J., dissenting) ("[I]n order to ensure that the injury is concrete and particularized, Sierra Club must show that the increased risk of a significant effect on environmental quality injures its member personally by demonstrating a 'geographic nexus' between individual members and the site of the injury."). Although it may be said that lack of an EA *always* increases the risk, this is not the case where it is fairly certain that the underlying project poses no threat to a plaintiff's concrete interests. In other words, there must be at least a nontrivial risk of harm.

ests connected to the Kahului Harbor area. Jeffrey Parker, also a member of the Kahului Harbor Coalition, is the president of Tropical Orchid Farm and concerned about the potential impact of the Superferry on increasing traffic, possible increase in the movement of drugs, and possible effects on recreational users of the harbor. As a farmer, he is also concerned about the negative effects that alien species introductions would have on his business. Ann Fielding, a board member of the Maui group of the Sierra Club and a member of Maui Tomorrow, operates a business, "Ann Fielding's Snorkel Maui," that offers educational shoreline snorkeling tours that focus on the coral reef. She attests that the introduction of alien marine species potentially caused by the Superferry would have a negative effect on the marine tourism industry, including her business. These business interests, which stem from environmental concern, are concrete and tied to the Superferry's operations at the harbor.

In addition to these alleged facts, several of the declarants above have also discussed the manner in which the Superferry may affect the interests expressed. Bernard discussed the potential for the Superferry to strike and harm whales, sea turtles, and monk seals that travel between Maui and Molokai, as well as the possibility of indirect effects due to the increased ease of access for fishers and hunters to Maui. Chun stated specific concerns about the ability of the Superferry to turn and dock itself in an already tight harbor without requiring that the canoe club's activities be dislocated. Fielding explained in detail the specific marine algae and jellyfish-type organisms that could be transported to Maui from O'ahu by the Superferry vessel or by travelers who may bring trailer boats, nets, and dive gear. Parker discussed the specific pests from other islands that are not endemic to Maui but could be inadvertently introduced to Maui by users of the Superferry traveling with their cars and other vehicles.

In short, each of these declarations show that members of the appellant groups have concrete interests in the Kahului Harbor area and Superferry's operation there, and demonstrate that should the project—insofar as it depends on the construction and utilization of harbor improvements—proceed without an EA the risk of harm to these interests is increased.

Appellants have also established causation and redressability. The injuries they assert are traceable to the actions of DOT in exempting Superferry from preparing an EA. *See Comm. to Save Rio Hondo,* 102 F.3d at 452 ("To establish causation, a plaintiff need only show its increased risk is fairly traceable to the agency's failure to comply with the National Environmental Policy Act."). The threat of increased risk is clearly redressable by the preparation of an EA, which would allow the threatened injuries raised by Appellants to be addressed and potentially mitigated or avoided. *See Citizens for Better Forestry,* 341 F.3d at 976 (holding that a party "who asserts inadequacy of a government's environmental studies ... [n]eed not show that further analysis by the government would result in a different conclusion ... It suffices that the agency's decision could be influenced by the environmental considerations that the relevant statute requires an agency to study."); *Massachusetts v. EPA,* 127 S.Ct. at 1453 ("When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."); *Fla. Audubon Soc'y,* 94 F.3d at 668 (en banc) (noting that procedural injuries are "easily redressable, as a court may order the agency to undertake the procedure").

b. *this case is distinguishable from Hawai'i Tourism Authority*

Appellees assert various reasons for why Appellants have failed to establish standing, most of which depend on their analogizing of Appellants' asserted injury to that found insufficient to confer standing in *Hawai'i Tourism Authority.* First, however, they argue that Appellants must demonstrate actual or threatened injury based on "the improvements at Kahului Harbor ... and DOT's exemption regarding the improvements," rather than the Hawaii Superferry project in general. As developed more fully

in discussion of the merits, the two are not so easily separable, as the harbor improvements were deemed by DOT to be "necessary to accommodate the start up" of the Superferry. Moreover, Appellants have identified potential harms to their use of the harbor area which the improvements directly facilitate, such as reduction of the quality of water for recreational use and the potential to dislodge recreational paddlers and surfers.

The remainder of Appellees' arguments depend on their interpretation of *Hawai'i Tourism Authority*. Thus, Appellees argue that: (1) the threatened injuries in this case are "virtually identical" to the insufficient injuries claimed in *Hawai'i Tourism Authority*, because Appellants lack evidence to show that the improvements to Kahului Harbor or the Superferry project will (a) increase visitor arrivals, (b) have any effect on traffic, or (c) interfere with the recreational use of the waters at Kahului Harbor "to any greater extent than is already being used for commercial purposes"; (2) there is no causal connection between the asserted injuries and the harbor improvements or Hawaii Superferry, because Appellants rely on "a chain of conjecture, ultimately resting on the independent actions of third parties such as the actions of hypothetical tourists not before this court," citing *Hawai'i Tourism Authority*, 100 Hawai'i at 254, 59 P.3d at 889 (plurality opinion); and (3) Appellants have failed to establish that their alleged injury is likely to be remedied by a favorable decision, because "there is nothing in the record to indicate that an abandonment of the Hawai'i Superferry would obviate the burden on Appellants' interests," because airlines, cruise ships, containerships, and other vessels would continue to carry visitors and cargo to and from Maui.

In *Hawai'i Tourism Authority*, petitioner Sierra Club challenged the Hawai'i Tourism Authority's (HTA) approval of the expenditure of $114 million in state funds on a tourism marketing plan without first conducting an EA. *Id.* at 248, 59 P.3d at 883 (plurality opinion). In denying standing, both the concurrence and the plurality opinion focused on the lack of a connection between the asserted environmental injuries

and HTA's failure to prepare an EA. *See id.* at 251–52, 59 P.3d at 886–87 (plurality opinion) (finding that it was "not evident" that the marketing program would result in the increase in the number of visitors alleged by petitioner, that there was no basis to conclude that increased traffic and use of recreational areas was due to the marketing program, and that the program therefore had not "concretely affected or threatened" petitioner's interests); *id.* at 268, 59 P.3d at 903 (Nakayama, J., concurring) ("Sierra Club does not have procedural standing because the nexus between the expenditure of funds and harm to the areas designated by Sierra Club members is attenuated."). The concurrence also expressed a concern that the challenged project in *Hawai'i Tourism Authority* lacked "a close correlation between agency action and use of land" apparent in federal cases recognizing procedural standing. *Id.* (Nakayama, J., concurring). As the concurrence explained, the plaintiff in *Hawai'i Tourism Authority*

alleges that HTA's proposed marketing plan would increase visitor traffic to the roadways frequently used by Sierra Club members, overuse of the beaches and parks frequented by the members of Sierra Club, the inability to bodysurf unobstructed by visitors in areas used by members of Sierra Club, the inability to enjoy the ocean and air without being interrupted by visitors using helicopters and watercrafts in areas used by members of Sierra Club, the introduction of non-native plants to Hawai'i's hiking trails used by members of Sierra Club, and the destruction of foliage to Hawai'i's hiking trails used by members of Sierra Club. However, all of the proposed possible effects on the roadways, beaches, and hiking trails used by Sierra Club members cannot be directly attributable to HTA's expenditure of funds. Rather, it is dependent upon the acts of independent actions of third parties not before this court—the visitors who, as a direct response to HTA's marketing plan, must choose to frequent Hawai'i, specifically the areas used by Sierra Club members, in increased numbers. This is not akin to the proposed agency projects that involve the construction of a freeway,

commercial use of land during previously off-peak seasons, or designation of land as critical habitat. *Id.* at 270, 59 P.3d at 905 (Nakayama, J., concurring). In other words, the challenged action was not sufficiently linked to the use of land, and would only affect the plaintiffs' interest in the land if tourists visited the same locations to which the plaintiffs had a geographic nexus.

Unlike *Hawai'i Tourism Authority*, Appellants have established a geographic nexus to a particular area—the Kahului Harbor area—which is the direct site of the challenged activity. Because of this, there is a clear causal connection between (1) DOT's decision to exempt the harbor improvements and associated Superferry activity from environmental review and (2) the risk that harm to Appellants' interests will not be addressed. Moreover, the potential harm alleged by Appellants does not depend on speculations about the "independent actions of third parties"—the potential harms would arise from the actual operations of the Superferry in the Kahului Harbor area, such as by unloading large numbers of cars, trucks, and trailers at a specified point, diverting paddlers and surfers, and increasing the risk of invasive species that would negatively affect the land and water near the harbor.

Therefore, the potential harms alleged by Appellants do not depend, as in *Hawai'i Tourism Authority*, on the precise number of individuals who choose to use the Superferry service, but on the nature of the operation itself. For the same reason, the Superferry presents particular risks that are not borne by the existing methods of transportation cited by Appellants, and thus Appellees' argument that the injury is not likely to be remedied by a favorable decision to Appellants is inapt. Appellees' argument that Appellants have failed to establish "any evidence" that improvements to Kahului Harbor or the Superferry project will increase visitor arrivals, affect traffic, or interfere with the recreational use of the waters at Kahului Harbor is likewise without merit.

Appellants have established all that can be asked of them in a HEPA case—they have: (1) shown both procedural and threatened injury in that the lack of an EA increases the risk of harm to their concrete interests; (2) established that they have concrete interests based on a geographical nexus to the Kahului Harbor area; and (3) articulated clear chains of causation explaining the manner in which the unmitigated activity may have an effect on their interests—demonstrating that the threat to their interests is at least nontrivial. If these Appellants do not have standing to bring this claim, it is hard to imagine who, if anyone, would.

### c. *group standing*

Appellees also contend that the injuries alleged by Appellants are "personalized injuries" "which were/will be suffered by the membership of the Sierra Club" so that Appellants do not have standing to sue based on injury to its members or officers. In reply, Appellants assert that "[w]hen some members of the group have standing, the group has standing."

In support of Appellees' proposition, they cite to *Hawaii's Thousand Friends v. Anderson*, 70 Haw. 276, 768 P.2d 1293 (1989), for their assertion that in order for a non-profit organization to bring suit on behalf of their membership, "the injury alleged by the organization must be suffered by the membership in general and the remedy provided to the organization would also remedy the injury suffered by the members individually."

In addition to the fact that *Anderson* is distinguishable,[42] our law on organizational

---

42. Appellees assert, without any explanation, that Appellants' alleged injuries are "personalized." In *Anderson*, the injuries, which were in the nature of misrepresentation, were described as "personalized" because "very few of [the organizational plaintiff's] members were injured in this way"—"[e]ach member who claims to have been misled would have undertaken different actions upon reliance on the misrepresentation,"

and "[t]he resultant injury, therefore, would be different for each person." *Id.* at 284–85, 768 P.2d at 1300. This is unlike the case here, where the individual members have alleged a common injury—the lack of an EA and attendant increased risk of unmitigated environmental harm—to concrete interests that are also shared by various members of the respective appellant groups, including recreational interests such as

standing has been substantially revised by a case decided after this appeal was filed, *Hawaii Medical Ass'n v. Hawaii Medical Service Ass'n, Inc.,* 113 Hawai'i 77, 148 P.3d 1179 (2006). In *Hawaii Medical Ass'n,* this court found that a state medical association had standing to bring an action against a health insurer for claims of unfair competition and tortious interference with economic advantage both on its own behalf and on behalf of participating physicians.

■■■ In so doing, this court explicitly adopted the approach taken by federal courts, stating that

> An association may sue on behalf of its members—even though it has not itself been injured—when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 95, 148 P.3d at 1197 (block quote formatting altered) (quoting *Hunt v. Wash. Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). Because Appellants meet this test, this court need not consider whether Appellants have demonstrated organizational standing based on injury to the appellant groups themselves, separate from any injury to their members. *See id.* at 100, 148 P.3d at 1202 ("An organization also has standing to sue for injury to its own interests, separate from any injury to its members, inasmuch as standing may be established in an individual or representative capacity.").

■■■ "Each of the three *Hunt* requirements must be met by a litigant asserting organizational standing." *Id.* at 95, 148 P.3d at 1197 (brackets removed). As demonstrated by the concrete interests and common injury caused by the lack of an EA elaborated above, the appellant groups' members

would have standing to sue on their own behalf. All declarants expressed their view that an EA is required to mitigate the risk of environmental harm—thus expressing a common injury. Moreover, the various interests expressed—recreational interests in surfing and paddling, aesthetic interests in snorkeling and whalewatching, environmental interests resulting from the potential introduction of alien species, and related business interests that may be affected—are shared by other members of the groups involved. To the extent that Appellees suggest that *all* members of a group must be injured in order for that group to have standing, such a proposition defies common sense and has been repudiated by federal courts applying the *Hunt* framework. *See, e.g., J–R Distribs., Inc. v. Eikenberry,* 725 F.2d 482, 485 n. 2 (9th Cir.1984) ("[T]he ACLU has standing to sue in this case if any one of its members suffers or is threatened with injuries that would create a justiciable case."), *overruled on other grounds by Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985); *cf. Playboy Enter., Inc. v. Pub. Serv. Comm'n,* 906 F.2d 25 (1st Cir.1990) (allowing standing based on injury suffered by *one* member of a trade association).

Appellees do not appear to contest the second prong, and it is apparent that this lawsuit seeks to protect interests that are germane to the organizational purposes of the Maui Group of the Sierra Club, Maui Tomorrow, Inc., and the Kahului Harbor Coalition. *See supra* Section III.A.2.a.

■■■ With regard to the third prong, there is no reason to believe that the claim asserted or the relief requested "requires the participation of individual members in the lawsuit." *Hawaii Med. Ass'n,* 113 Hawai'i at 95, 148 P.3d at 1197. Individual participation may be required in cases where the plaintiffs request money damages (which may require

---

surfing and paddling, and environmental and economic interests that are threatened by the potential introduction of invasive species on Maui. These interests are shared by other members of the appellant groups, and not particularized to the declarants who raised them. Moreover, the remedy of an EA would redress their

concerns of an unmitigated risk of harm. *See id.* ("More important [to recognizing the ability of a non-profit organization to bring suit on behalf of its members], the remedy which could be provided to the organization by a favorable judicial decision would also remedy the injury suffered by the members individually.").

proof of individual injuries), *see id.* at 96, 148 P.3d at 1198 ("Because claims for monetary damages would require the significant participation of individual members, such factor would fatally undercut a request for organizational standing."), or where there are conflicts of interest or great divergence between members of the organization or between the organization and its members, among other reasons. 13 Wright, Miller & Cooper, *supra,* § 3531.9, at 618 (citing, *inter alia, Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), *Int'l Union, United Auto. Workers of America v. Dana Corp.,* 697 F.2d 718 (6th Cir.1983)). But Appellants do not request money damages in this suit, and there is no other reason to believe that individual participation in this lawsuit would be required.[43]

Therefore, Appellants have met each prong of the *Hunt* test, and have satisfied the requirements of organizations to sue on behalf of their members.

B. *The Merits: Whether Appellees, as a Matter of Law, Complied with HEPA*

On the merits,[44] Appellants argue that DOT's exemption determinations were in violation of the law because: (1) DOT failed to review the secondary and cumulative impacts of the project as a whole; (2) DOT failed to apply the significance criteria to the Superferry project; (3) Appellees admit that Superferry may have significant adverse impacts, so that an EA is required; (4) the exemptions violate the intent of the categorical exemptions; (5) DOT failed to consult with agencies and individuals with expertise about the propriety of the exemptions; and (6) the two selected exemptions relied on are inapplicable as a matter of fact and law.

Appellees make two principal arguments for upholding the circuit court's conclusion that DOT complied with HEPA: (1) that DOT followed all proper procedures in issuing its exemption decision, and therefore met the requirements of HEPA and HAR § 11–200–8 and (2) that Appellants' arguments regarding the propriety of the exemptions are irrelevant and without merit, because DOT's determination was supported by the record.

Before discussing Appellants' points of error, we address Appellees' first argument, the essence of which has already been discussed in the standard of review section. Appellees appear to argue that HAR § 11–200–8, the rule governing exemptions, allows agencies to declare an action falling within a designated class exempt *"provided only "*— they claim—"that the agency obtain the advice of other agencies or individuals having jurisdiction or expertise as to the propriety of the exemption." [45] In other words, they equate compliance with the consultation proviso as satisfaction of the administrative rule, and do not believe it is within the province of the courts to inquire into the *propriety* of DOT's exemption determination. Accordingly, Appellees argue that they have met the consultation requirement, because DOT sought and received OEQC's advice specifically pertaining to the harbor improvements, and also sought advice from the Maui Department of Public Works and Waste Management as well as the Maui Department of Planning.

■ Appellees' argument is akin to their position, discussed *supra* Section II.C, that the courts should defer to agency determina-

**43.** Appellees appear to concede that the Appellants' requested remedy is not one that would fail to remedy the injury suffered by members of the appellant groups, as they discuss this rule but do not argue that it would apply. While Appellants' arguments that the injuries in this case are "personalized" may be relevant to the "individual participation" prong of the *Hunt* test, they have provided no basis for this assertion, and there is no reason to believe that the asserted injury is of a personalized nature. *See supra* note 42.

**44.** Appellants' first enumerated argument, that HEPA's exemptions should be narrowly con-

strued, is more akin to an argument about the standard of review, and is accordingly dealt with in that section. *See supra* note 22.

**45.** While the rule does have a proviso requiring that "agencies declaring an action exempt ... shall obtain the advice of other outside agencies or individuals having jurisdiction or expertise as to the propriety of the exemption," HAR § 11–200–8, it does not indicate that this is the *only* requirement of a proper exemption, as Appellees seem to suggest in their answering brief. *See supra* note 8.

tions regarding exemptions. However, as elaborated above, HEPA and its implementing regulations require more than facial compliance with the consultation proviso and a determination that an action falls within an exempt class. In addition, an agency must consider the exclusions to the exemption spelled out in HAR § 11–200–8(B), and whether the exemption is consistent with the letter and intent of HEPA because it will "probably have minimal or no significant effects on the environment," both of which are disputed by Appellants. Because Appellees have incorrectly characterized the requirements of HEPA and the EIS rules regarding exemption determinations, Appellees argument for limited review of DOT's actions is unwarranted.

We now turn to Appellants' principal argument, and in our view the crux of this case, that the circuit court erred in ruling that DOT had complied with HEPA, because under the regulatory and statutory framework DOT was required, "in making exemption determinations, to review all phases of a project as a whole, without segmentation, and to review the secondary and cumulative impacts of the project." In short, the dispute is whether DOT was correct to analyze only the harbor improvements in making its exemption determination, or was also required to consider the potential environmental impacts caused by the Hawaii Superferry project.

Appellants' argument on this point is composed of three subparts: (1) DOT failed to review and analyze the environmental impacts of the Hawaii Superferry project as whole/connected actions; (2) DOT failed to review the secondary impacts of the Hawaii Superferry project; and (3) DOT failed to address the exclusions to the exemptions, which Appellants assert are applicable.

Before addressing these arguments, we note that this issue is dispositive of the case. It is not disputed that the harbor improvements—which propose the use of state funds and state lands—are a triggering "action" under HEPA; the only question is whether an exemption applied. If DOT was required to consider the Superferry project itself, as opposed to the harbor improvements alone,

in making this exemption determination, it is clear that the exemption would not apply. The fact that Hawaii Superferry, Inc. has undertaken operating plans and developed policies to minimize its effect on the environment, *see supra* Section I.B.3, although laudatory, indicates a probability that absent these voluntary policies, the ferry's operations would have more than minimal environmental effects. Although we do not take Garibaldi's comments to that effect as a direct admission that the Superferry will cause significant effects on the environment, they make clear that the Superferry project itself—were its environmental effects considered—does not meet the standard of an exempt action, *i.e.,* a "minor project" that will "probably have minimal or no significant effects on the environment." *See supra* Section II.C; HAR § 11–200–2; *Kahana Sunset Owners Ass'n,* 86 Hawai'i at 71, 947 P.2d at 383.

### 1. Connected Actions Under HAR § 11–200–7

■ Appellants argue that DOT committed legal error in its exemption determination because it failed to consider the Superferry project and the harbor improvements as a "single action." In support of this contention, Appellants cite to *Kahana Sunset Owners Ass'n,* which discussed the application of HAR § 11–200–7 in the context of exemption determinations. As discussed *supra,* Section II.C, in *Kahana Sunset Owners Ass'n* this court considered whether installation of a drainage pipe under a public street required environmental review under HEPA, or would fall within an exemption for "[i]nstallation of drains, sewers and waterlines within streets and highways," on the list of exempt classes of action developed by the Maui Planning Commission. 86 Hawai'i at 71, 947 P.2d at 383. The context of this determination was a request, by the developer, for an SMA use permit to install a drainage line beneath a public road that would connect it to an existing culvert beneath the highway—and provide a drainage system for the 312–unit residential development. After determining that the exemption did not apply, based on the letter and intent of the

administrative regulations, *see infra* Section II.C, so that an EA was necessary, the court went on to consider the "scope" of the EA. Applying HAR § 11–200–7, the court concluded that an EA must address the environmental effects of the entire proposed development, not just the drainage system, reasoning as follows:

> HAR § 11–200–7 provides that "[a] group of actions proposed by an agency or an applicant shall be treated as a single action when: (1) The component actions are phases or increments of a larger total undertaking; [or] (2) An individual project is a necessary precedent for a larger project." In the instant case, the action proposed by JGL is the entire Napilihau development. The proposed drainage system is part of the larger project and is a "necessary precedent" for the development. The drainage system has no independent utility. It would not be constructed except as part of the larger development. Isolating only that particular component of the development for environmental assessment would be improper segmentation of the project.

*Id.* at 74, 947 P.2d at 387.

Based on *Kahana Sunset Owners Ass'n,* Appellants argue that: (1) HAR § 11–200–7 should apply in this case and (2) when applied, the rule would require that DOT, in making its exemption determination, consider the environmental effects of the Hawaii Superferry project, because the harbor improvements are a "necessary precedent" to a larger action. Appellees do not provide any argument regarding whether HAR § 11–200–7 should apply to DOT's exemption determination. Rather, Appellees seek to factually distinguish *Kahana Sunset Owners Ass'n,* stating that in that case

> the court specifically distinguished [the 'completely new drainage system serving over 300 residences,' *id.* at 73, 947 P.2d at 385] from minor change to existing facilities, which would have been exempt. This latter situation is what is at issue in this case—i.e. DOT is making minor improvements to the existing harbor. Such minor changes to an existing facilities [sic] do not require an EA.

It appears that Appellees do not contest that agencies making exemption determinations must consider HAR § 11–200–7 as a preliminary step in defining the action at issue. *See supra* Section II.C. Rather, they contest its applicability to the facts of the case. HAR § 11–200–7 is part of subchapter 5 of the EIS Rules, which is entitled "Applicability." The rule commands that "[a] group of actions proposed by an agency or an applicant shall be treated as a single action" when one of four conditions is met. HAR § 11–200–7. Although this court in *Kahana Sunset Owners Ass'n* applied HAR § 11–200–7 when considering the scope of the EA that would be required, both the nature of the rule and its placement within the larger scheme of the EIS rules indicate that it is a threshold determination that must be made in order to define how to "treat" the action under consideration. We therefore conclude that it should be applied to exemption determinations.

On these facts, however, there is no "group of actions" to be treated as a single action. Therefore, HAR § 11–200–7 does not apply. HAR § 11–200–7, entitled "Multiple or Phased Applicant or Agency Actions" mandates that:

> A group of actions proposed by an agency or an applicant shall be treated as a single action when:
>
> A. The component actions are phases or increments of a larger total undertaking;
>
> B. An individual project is a necessary precedent for a larger project;
>
> C. An individual project represents a commitment to a larger project; or
>
> D. The actions in question are essentially identical and a single statement will adequately address the impacts of each individual action and those of the group of actions as a whole.

HAR 11–200–7. The rule discusses situations when a "group of actions ... shall be treated as a single action." The word "action" is defined in the EIS rules as "any program or project to be initiated by an agency or applicant." HAR § 11–200–2.

While the harbor improvements certainly constitute an "action," because they were initiated by DOT (an "agency" [46]), Appellants have produced no argument to demonstrate that the Superferry project itself is an "action"—either because it was initiated by an agency or an applicant. Appellants have not identified an official request for approval that was required in order for the project to proceed, making the Superferry itself a "project ... initiated by an ... applicant." [47] HAR § 11–200–2. Therefore, HAR § 11–200–7 does not apply, as there is no "group of actions" that may be treated as a single action.

Rules like HAR § 11–200–7 are meant to keep applicants or agencies from escaping full environmental review by pursuing projects in a piecemeal fashion. *See Guidebook* at 19 ("The proposed action must be described in its entirety and cannot be broken up into component parts which, if each is taken separately, may have minimal impact on the environment. Segmenting a project in this incremental way to avoid the preparation of an environmental impact statement is against the law."); Kenneth A. Manaster & Daniel P. Selmi, 2 *State Environmental Law* § 13.10 (2006) (discussing the problem of "segmentation" or "piecemealing" of projects, including "situations ... in which the agency tries to mask the full nature of its project or divides up what is clearly a larger action into smaller pieces that will be implemented simultaneously," "where a private applicant plainly has definite plans for additional, related projects in the future," or where "a project unquestionably will give rise to later, secondary actions by other individuals[.]"). However, because the rule for assessing multiple actions depends on the formal require-

ment of discrete "actions," it would appear not to apply to projects such as this one where government plays a facilitative role for a private project that itself does not constitute an applicant action.

### 2. Secondary Impacts

■ Appellants next argue that the Superferry project must be considered as a secondary impact of the harbor improvements. Appellants thus contend that the circuit court's decision should be reversed because "HDOT, in its exemption determination, never analyzes the environmental impacts that the[ ] harbor improvements, in facilitating the Hawaii Superferry project, will have...." Appellants' argument with respect to secondary impacts relies on two cases: *McGlone v. Inaba,* 64 Haw. 27, 636 P.2d 158 (1981), and *Ocean Advocates v. U.S. Army Corps of Engineers,* 402 F.3d 846 (9th Cir.2005).

#### a. *McGlone*

In *McGlone,* a group of concerned persons brought suit to enjoin the Board of Land and Natural Resources (BLNR) from approving construction of underground utilities on conservation land without an EIS. 64 Haw. at 28, 636 P.2d at 160. The BLNR had approved a conservation district use application (CDUA) filed by landowners on a residential lot near the Paiko Lagoon Wildlife Sanctuary in East Oʻahu, to construct and install underground utilities through an adjacent, state-owned lot—over which they had a perpetual non-exclusive easement—in order to serve a house they planned to build on the residential lot. *Id.* at 29, 636 P.2d at 160. In approving the CDUA, the BLNR determined

**46.** "Agency" is defined by the rules as "any department, office, board, or commission of the state or county government which is part of the executive branch of that government." HAR § 11–200–2.

**47.** An "applicant" is defined as "any person who, pursuant to statute, ordinance, or rule, officially requests approval from an agency for a proposed action." HAR § 11–200–2. "Approval," in turn,

> means a discretionary consent required from an agency prior to actual implementation of an action. Discretionary consent means a con-

sent, sanction, or recommendation from an agency for which judgment and free will may be exercised by the issuing agency, as distinguished from a ministerial consent. Ministerial consent means a consent, sanction, or recommendation from an agency upon a given set of facts, as prescribed by law or rule without the use of judgment or discretion.

*Id.* Although Hawaii Superferry, Inc. applied for and received a certificate for public convenience and necessity from the PUC, *see supra* note 5, Appellants did not challenge this approval directly nor argue that it constituted an "action."

that an EIS was not required because the proposed activity fell under an exemption of the then-applicable EIS Rules. *Id.* at 29, 636 P.2d at 161. Although the court ultimately found that the exemption was proper, in the course of its analysis it explained several concepts relevant to review of exemption determinations generally.

First, the court discussed the term "significant effect," a term that was then and is currently used in determining which types of actions may be declared exempt. *See* HRS § 343-6(7) (1993) (delegating to the environmental council the establishment of procedures "whereby specific types of actions, because they will probably have minimal or no *significant effects* on the environment, are declared exempt from the preparation of an assessment" (Emphasis added.)).[48] In reference to the concept of "significant effect," the court stated that "an agency making such a determination must consider every phase and every expected consequence of the proposed action," citing EIS regulations.[49] 64 Haw. at 35, 636 P.2d at 164. The concerned citizens had argued that an exclusion to the exemption should apply because the wildlife sanctuary was a "particularly sensitive environment" which would be significantly affected by the construction of the underground utilities and the construction, use, and occupancy of the house. *Id.* at 36, 636 P.2d at 165.

The BLNR had found that the proposed activities would not have a significant effect on the sanctuary. *Id.* at 37, 636 P.2d at 165. In reviewing this determination, the court followed the BLNR's designation of the construction of the underground utilities as the "primary impact," *id.* at 37 n. 14, 636 P.2d at 165 n. 14, and the construction, use, and occupancy of the house as the "secondary impact"—because the latter was "incident to and a consequence of the primary impact." *Id.* at 38 n. 16, 636 P.2d at 166 n. 16. The court thus stated that "the effects of such 'secondary impacts', like 'primary impacts', must be considered in determining the relative environmental effects." *Id.* at 38 n. 16, 636 P.2d at 166 n. 16. Reviewing the alleged effect of these impacts on the Paiko Lagoon, the court held that the BLNR had not erred in its finding, and that the exemption was therefore proper. *Id.* at 39, 636 P.2d at 166–67.

The court in *McGlone* also discussed what it termed "the limited nature of categorical exemptions":

As noted earlier, these activities are designated exempt because it is presumed that under ordinary circumstances there occurs negligible environmental impact. However, what is normally presumed to be innocuous activities may constitute actions which will significantly affect the environment when done in "sensitive" areas or under varying circumstances. *Merely because the proposed activities here are listed as exempt does not make it so. The building of a house and the support facilities are only deemed exempt because it will probably not have a significant effect under the totality of circumstances.*

48. Although the pre-1979 HEPA statute, which governed in *McGlone*, varied in significant ways, the basic structure for exemptions appears to be similar in form to the present structure. The original HEPA statute authorized another body "to establish guidelines specifying classes of actions which will be exempt from the preparation of an EIS because such actions will probably have minimal or no significant effect on the environment." *McGlone,* 64 Haw. at 35, 636 P.2d at 164 (citing HRS § 343-5). The exempt classes themselves appear to be the same or similar to the present list embodied in HAR § 11-200-8. *See id.* at 36 n. 11, 636 P.2d at 165 n. 11.

The major difference between the original statute and the post-1979 version is that the original did not require the production of EAs. Instead, an EIS was required for any action which "will probably have significant environmental effects," and also had a connection to state land or funds. HRS 343-4 (1976). The "significant effect" term was also used in reference to the rules for establishing exempt classes, using the same language as the current HRS § 343-6(7). *Id.* at 35, 636 P.2d at 164.

49. This statement is similar to that embodied in HAR § 11-200-12, "Significance Criteria," which states in part:

In determining whether an action may have a significant effect on the environment, the agency shall consider every phase of a proposed action, the expected consequences, both primary and secondary, and the cumulative as well as the short-term and long-term effects of the action.

HAR § 11-200-12(B).

*Id.* at 36 n. 12, 636 P.2d at 165 n. 12 (emphasis added).

Therefore, according to *McGlone,* an agency making an exemption determination must look beyond an action's facial compliance with an exemption class, and also determine that the activity will probably not have a significant effect. This is consistent with the view expressed in *Kahana Sunset Owners Ass'n* that exemption determinations "must be consistent with both the letter and the intent contained within the administrative rule exemption," 86 Hawai'i at 71, 947 P.2d at 383, discussed *supra* in Section II.C. Moreover, *McGlone* makes clear that in making this determination, the agency must consider not just the effect of an action on the direct site to which the exemption applies (the "primary impact"), but also secondary impacts that are "incident to and a consequence of the primary impact."

Based on *McGlone,* Appellants argue that "[a]ny purported exempt activity must, by law, include an analysis of that activity's potential connected actions, secondary impacts, significant effects and cumulative impacts." Because the agency did not analyze this totality of circumstances, Appellants contend, "the exemption is illegal and void." Appellants also assert that "the harbor improvements are a condition precedent to the Hawaii Superferry project and the impacts of the Hawaii Superferry project must also be addressed."

In response to these arguments, Appellees contend that *McGlone* is not controlling because the case "was based on the pre 1979 version of HEPA which did not include the concept of EAs or draft EAs." While this is true, Appellees provide no argument as to why the subsequent changes in the HEPA statute make *McGlone's* analysis inapplicable to the case at hand. To the contrary, because *McGlone* specifically concerned an exemption determination under a similar statutory and regulatory scheme, *see supra* note 48, the statements of the court in that case regarding exemptions have persuasive force in interpreting the requirements of HEPA today.

### b. *Ocean Advocates*

Appellants also rely on *Ocean Advocates,* a Ninth Circuit Court of Appeals case in which an environmental group challenged, under NEPA, the issuance and extension of a permit by the Army Corps of Engineers (the Corps) that allowed for the construction of an additional platform to an existing oil refinery dock off the coast of Washington state, at Cherry Point in northeast Puget Sound. 402 F.3d at 855–58. At issue was whether the pier extension would "facilitate an increase in tanker traffic and product handling, thereby increasing the likelihood of a major oil spill." *Id.* at 855. The Corps granted the permit at issue and made a finding of no significant impact, determining that the pier addition "will not significantly affect the quality of the human environment," and that an EIS was not required. *Id.* at 856. The environmental group, Ocean Advocates (OA), having twice asked the Corps to reopen the permit it had granted in order to perform a more complete evaluation of the cumulative impacts that the new platform would have on vessel traffic safety, was twice rebuffed. *Id.* at 856–57. Several years later, when the developer requested a one-year extension to its permit to complete the dock construction, OA and other groups again expressed concerns to the Corps about the harbor extension, and filed suit after the Corps again concluded that an EIS was not required. *Id.* at 857–58.

Reversing the district court, the Ninth Circuit held that the Corps must complete an EIS, because it found that a "reasonably close causal relationship" existed between the Corps' issuance of the permit, the environmental effect of increased vessel traffic, and the attendant increase risk of oil spills. *Id.* at 867–68. It thus concluded:

Increased tanker traffic elevates the risk of oil spills—an undeniable and patently apparent risk of harm to Puget Sound. An oil spill could destroy and disrupt ecosystems and kill or injure critical numbers of threatened and endangered species that live, and thrive, in the Cherry Point Region. *The Corps failed to appreciate that the permitted activity would lead to increased tanker traffic, an error about the fundamental nature and severity of the*

*impact that the dock extension would have.* The obvious severity of the impact that increased tanker traffic poses is enough to warrant reversal on OA's NEPA claim. Were we unconvinced, however, some of the Council on Environmental Quality factors also demonstrate the significance of increased tanker traffic on this ecologically sensitive area, particularly cumulative significant impacts and uncertain environmental impacts.

*Id.* at 868 (emphasis added). Although the dock extension had already been completed, the court nevertheless required that the Corps conduct an EIS, because the Corps could revoke the permit or "impose restrictions on the operation of the dock or require other mitigating measures." *Id.* at 871. The Ninth Circuit remanded to the district court to consider OA's request that the district court "issue an injunction freezing any vessel traffic to and from the facility at pre–2000 levels pending completion of the NEPA process." *Id.* at 871–72.

Appellants argue that DOT's limitation of its consideration to the direct effects of the harbor improvements, rather than of the Superferry operations at Kahului harbor, is similar to the Corps' failure to recognize the potential for increased tanker activity due to the dock extension in *Ocean Advocates.* Accordingly, Appellants state:

> HDOT, in its exemption determination, does not disclose that these improvements are conditions precedent to the implementation of the Hawai'i Superferry project. Most importantly, HDOT, in is exemption determination, never analyzes the environmental impacts that these harbor improvements, in facilitating the Hawai'i Superferry project, will have on already congested state harbors and roadway systems, as well as on threatened and endangered species, an increase in the rate of alien species introductions, and the curtailment or restriction of recreational and cultural uses. All of these are clear errors requiring reversal. . . .

Appellees, for their part, argue that *Ocean Advocates* is inapplicable, because it involved the adequacy of the Corps' analysis in its Final EA, and did not involve a "decision not to prepare an EA" as Appellants state in their brief. Appellees also take issue with Appellants' citation of *Ocean Advocates* as support for its assertion that "uncertainty about the impacts of a project have been sufficient to require EISs and to reverse exemptions."

Appellees' attempts to minimize the applicability of *Ocean Advocates* miss the point. Regardless of Appellants' apparent misstatements regarding the case, *Ocean Advocates* is persuasive authority regarding how a factually-similar scenario is treated under NEPA, and provides an example of a court analyzing the secondary effects of harbor alterations, namely, what effect they will have on the activity of ocean vessels.

### c. *application to this case*

 *Kahana Sunset Owners Ass'n* and *McGlone* make clear that when an agency considers an exemption it must determine that the action will probably have minimal or no significant effects on the environment, and *McGlone* teaches that in addition to the direct site of impact the agency must also consider other impacts that are "incident to and a consequence of the primary impact." Considered together with these Hawai'i precedents, *Ocean Advocates* provides a concrete analogy to the legal error committed by DOT.

DOT's written exemption determination is restricted to the harbor improvements and does not consider the secondary impacts that may result from the use of Hawaii Superferry in conjunction with Kahului Harbor. Rather, DOT treats the physical improvements in isolation, fitting them into two exemption classes related to "security and safety equipment," (exemption class 3 item 3) and "alteration or addition of improvements with associated utilities, which are incidental to existing harbor and boat ramp operations, in accordance with master plans [that comply with HEPA]" (exemption class 6 item 8). *See supra* Section I.B.2. Although DOT, in its exemption determination letter, does reference the Hawaii Superferry ("we have determined that the operation of Hawaii Superferry at Kahului Harbor conforms with the intended use and purpose of the harbor and

meets conditions that permit exemption from environmental review at such location based on the method of operation planned"), it restricts its analysis to the harbor equipment that will be employed in order to facilitate the Superferry's operation ("ferry activity at Kahului Harbor will use equipment appropriate for a harbor, include only minor facilities improvements and will be conducted at an existing pier facility that is consistent with the purpose and reason for which it was originally developed"). *See id.* The exemption letter does not consider whether Superferry operation independent of the harbor will have any significant effect on the environment. Rather, DOT appears to studiously restrict its consideration of environmental impact to the physical harbor improvements themselves. Although DOT does say that "[t]he installation *and result* of the minor improvements noted will not produce or create any adverse air quality, noise or water quality impact," which could imply a reference to the Superferry itself, as the "result" of the harbor improvements, this statement is oblique and does not indicate that secondary impacts were considered. Purposely or not, DOT ignores the more direct language suggested by OEQC in its sample exemption memorandum, wherein an agency director would state that he or she "ha[s] considered the potential effects of the above listed project as provided by Chapter 343, HRS and Chapter 11–200, HAR ... [and] declare[s] that th[e] project will probably have minimal or no significant effect on the environment and is therefore exempt from the preparation of an environmental assessment." *Guidebook, supra* at 50.

■ As suggested by Appellees, it is not the province of this court "to substitute its judgment for that of an agency within the executive branch of government...." *Obayashi Hawaii Corp.*, 81 Hawai'i at 182 n. 12, 914 P.2d at 1375 n. 12. The flip side of this caution, however, is that this court "must

ensure that the agency has taken a 'hard look' at environmental factors." *Id.* at 182 n. 12, 914 P.2d at 1375 n. 12 (quoting *Stop H–3 Ass'n v. Lewis*, 538 F.Supp. at 159).

The applicable standard of review requires that this court determine, as a matter of law, whether or not DOT has followed the correct procedures and considered the appropriate factors in making its determination that the harbor improvements made to Kahului harbor to facilitate the Superferry project should be exempted from the requirements of HRS chapter 343. *See supra* Section II. C.3.

Stated simply, the record in this case shows that DOT did not consider whether its facilitation of the Hawaii Superferry Project will probably have minimal or no significant impacts, both primary and secondary, on the environment. Therefore, based on this record, we can only conclude that DOT's determination that the improvements to Kahului Harbor are exempt from the requirements of HEPA was erroneous as a matter of law. The exemption being invalid, the EA requirement of HRS § 343–5 is applicable. This issue being dispositive, we need not consider Appellants' other arguments.[50]

## IV. CONCLUSION

The stated purpose of HEPA is "to establish a system of environmental review which will ensure that environmental concerns are given appropriate consideration in decision making along with economic and technical considerations." HRS § 343–1.

In enacting HEPA and establishing a system of environmental review, the legislature expressly emphasized the importance of public participation in the process:

The legislature further finds that the process of reviewing environmental effects is desirable because environmental consciousness is enhanced, cooperation and coordination are encouraged, and *public partic-*

---

50. Although we hold that the harbor improvements were not a proper candidate for exemption because of their secondary impacts, we note that even if the harbor improvements were considered in isolation, the record is devoid of facts which would indicate that DOT's exemption Class 6 item 8 was applicable, because there is

no evidence that the improvements were "in accordance with master plans that have met the requirements of Chapter 343, Hawaii Revised Statutes." Comprehensive Exemption List for the State of Hawaii Department of Transportation, *supra* note 13. *See supra* note 11.

*ipation during the review process benefits all parties involved and society as a whole.*

*Id.* (emphasis added).

Contrary to the expressly stated purpose and intent of HEPA, the public was prevented from participating in an environmental review process for the Superferry project by DOT's grant of an exemption to the requirements of HRS chapter 343. The exemption was erroneously granted as DOT considered only the physical improvements to Kahului harbor in isolation and did not consider the secondary impacts on the environment that may result from the use of the Hawaii Superferry in conjunction with the harbor improvements. "All parties involved and society as a whole" would have benefitted had the public been allowed to participate in the review process of the Superferry project, as was envisioned by the legislature when it enacted the Hawai'i Environmental Policy Act.

Based on the foregoing, we vacate the circuit court's July 12, 2005 final judgment. As indicated in our August 23, 2007 order, we have instructed the circuit court to enter summary judgment in favor of Appellants on their claim as to the request for an environmental assessment and remanded the case for such other and further disposition of any remaining claims as may be appropriate.